J-S51001-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| K.K.B., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| E.D.B., | |
| Appellant | No. 217 MDA 2014 |

Appeal from the Order Entered December 19, 2013
In the Court of Common Pleas of Berks County
Civil Division at No(s): 13-26481

BEFORE:  BOWES, OTT, and MUSMANNO, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED SEPTEMBER 09, 2014**

E.D.B. ("Father") appeals from the final protection from abuse ("PFA") order entered on December 19, 2013.  The order abrogated the existing custody arrangement with K.K.B. ("Mother") and prohibited Father from contacting Mother and six of their seven children for three years.[1]  We affirm, and we deny the remaining aspect of Father's motion for intervention.

Mother and Father endured a turbulent and violent marriage that produced six children between 2002 and 2010.  When the most recent episode underlying this appeal occurred, the parties were separated but

_____

[1]  The couple has an additional child who no longer lives at home.  She was not listed on the PFA petition as a person seeking protection from abuse and she is not subject to the no-contact order.

remained legally married. The custody order in effect at the relevant time awarded the parties shared legal custody and granted Mother primary physical custody of the children. Father exercised periods of supervised partial physical custody with the children. Additionally, Berks County Child and Youth Services ("CYS") is involved with the family. Four of the parties' children have been adjudicated dependent. Three children reside with Mother, and the oldest child remains in CYS placement in a therapeutic foster home. As part of the children's safety plan, CYS insisted that Father's visitations be supervised.

Mother is a homemaker. Father is employed as a correctional officer at SCI Graterford in Collegeville, Pennsylvania. Between 3:30 and 4:00 p.m., on December 4, 2013, Mother was in the office of her attorney, Lauren Marks, Esquire, who represented her in the dependency proceedings. Attorney Marks's office was located on the first floor of 12 North 6th Street in Reading, Pennsylvania. Mother went to the office directly from a hearing at the Berks County Courthouse located across the street. She was hysterical and ranting about several baseless accusations that Father leveled against her to the FBI, CYS, and her parole officers in a futile attempt to have her probation revoked. Mother did not have an appointment, and Attorney Marks was counseling another client in her office. Accordingly, Attorney Marks and her secretary received Mother in the front lobby of the firm. While Mother and Attorney Marks were discussing Father's actions, Mother was advised that Father was loitering across the street from the

building, peering through the law firm's window at Mother as she engaged in her consultation. Attorney Marks went to the window and observed Father "standing there . . . in the same jacket that he is wearing in court today, staring into my office . . ." N.T., 12/19/13, at 115. Attorney Marks knew Father from her involvement as Mother's counsel during the previous year in the dependency proceedings. She was present at several CYS hearings that Father attended, the most recent occurring only weeks prior to the December 4, 2013 episode. As Mother was visibly shaken, Attorney Marks guided her to a windowless office as her secretary continued to watch Father standing across the street. Eventually, Father boarded a bus and left the area.

Mother was terrified by Father's actions, and based upon the history of his abusive behavior, the next day, she filed a PFA petition seeking protection against him on behalf of herself and six of their children: A.K.B., H.B., E.B. III, M.B., J.B. and D.B. The petition invoked Father's false reports, harassment, and alleged that he stalked her and the children on several prior occasions. She added that Father was arrested during 2005 for pointing a firearm at her head and again during 2009 for attempting to kidnap the children following Mother's award of primary custody. On the same day that Mother filed the PFA petition, the trial court issued a temporary *ex parte* PFA order that prohibited Father from contacting Mother and the six children and barred him from possessing, transferring or acquiring any firearms for the duration of the order. On December 12,

2013, the trial court amended the order to permit Father to continue to possess his firearm "to perform his essential job functions as a Correctional Officer." Trial Court Order, 12/13/12. The latter amendment was effective pending the final PFA order. *Id*.

During the ensuing PFA hearing, at which both parties were represented by counsel, Mother testified about several instances of abuse that occurred over the course of the parties' tumultuous relationship, including Father's stalking behavior on December 4, 2013. Mother also presented her mother's testimony and called Attorney Marks as a rebuttal witness. The oldest child listed on the PFA petition, A.K.B., testified *in camera* about Father's behavior generally, including his clandestine attendance at her afterschool functions and her observation of him sitting in his vehicle parked outside of Mother's residence during a sibling's birthday party.

Father testified that he was working at the secured facility at SCI Graterford on December 4, 2013, and he presented three witnesses to support his alibi. In addition, a family friend, who opened her home to Mother and Father for two months in the past, testified that she did not observe any physical abuse and that, while Mother and Father argued often, she never feared for either person's safety during that period. Finally, Father attempted to introduce two exhibits into evidence: (1) a time sheet from the prison logging his hours of employment on the relevant dates; and (2) a set of receipts depicting his travel to and from work in Collegeville on

the Pennsylvania Turnpike. The trial court admitted the receipts into evidence but sustained Mother's objections to the time sheets. Based on the evidence adduced at the hearing, the trial court entered the above-referenced PFA order that, *inter alia*, prohibited Father from contacting Mother or the six enumerated children for a period of three years and directed him to relinquish his firearms to the Sherriff of Berks County or a third party in possession of a safekeeping permit. This timely *pro se* appeal followed.

On April 23, 2014, Father filed with this Court a self-styled Motion for Intervention With an Extension of Time to File Briefs. The motion alleged, in pertinent part, that he possessed new evidence that would have altered the outcome of the PFA proceeding if it had been submitted to the trial court. Father requested additional time to prepare and file his *pro se* brief in light of the new evidence.[2] On April 30, 2014, we granted Father a thirty-day extension to file his brief and deferred any consideration of the new-evidence claim to the merits panel.

_____

[2] Although the motion did not identify the purportedly new and extraordinary evidence, Father attached a petition to vacate the PFA order that he previously filed with the trial court. That petition invoked new extraordinary evidence in the form of a time-stamped digital video recording of the shift change at SCI Graterford on December 4, 2013. He contends that the video recording substantiates the alibi defense he proffered during the PFA hearing. The trial court denied the petition to vacate without prejudice due to a lack of jurisdiction. Father has reasserted this allegation in his reply brief filed with this Court.

Father levels twelve assertions of trial court error:

1. Did the trial court err and abuse its discretion when it initially allowed allegations from plaintiff that were clearly a tactical maneuver in current custody, divorce, and dependency proceedings?

2. Did the trial court err and abuse its discretion when it did not allow defendant's evidence to be submitted as exhibits?

3. Did the trial court err and abuse its discretion when it allowed testimony by plaintiff from other court proceedings?

4. Did the trial court err and abuse its discretion when it allowed plaintiff to testify [about] allegations that allegedly occurred more then [sic] three (3) years ago?

5. Did the trial court err and abuse its discretion when it acted in a prejudice, biased , and ill will manner in favor of the plaintiff?

6. Did the trial court err and abuse its discretion when it allowed the parties['] minor eleven (11) year old daughter to testify?

7. Did the trial court err and abuse its discretion when it allowed Plaintiff[']s attorney from another proceeding to testify?

8. Did the trial court err and abuse its discretion when it placed a final order without plaintiff producing any evidence?

9. Did the trial court err and abuse its discretion when it placed a final order when the plaintiff neglected to prove allegations of abuse by a preponderance of the evidence?

10. Did the trial court err and abuse its discretion when it placed a final order when the plaintiff neglected to show clear and convincing evidence of abuse?

11. Did the trial court err and abuse its discretion when it issued an order which prohibits appellant from having any contact with his children for a period of three years absent a showing that any abuse ever occurred?

12.   Did the trial court commit reversible error when it gave more weight to the testimony of plaintiff's witness, because of her status of an attorney, in spite of evidence demonstration plaintiff did not meet her burden?

Father's brief at 10-12.

For judicial convenience we separate Father's twelve unwieldy assertions into three manageable categories: (1) allegations that the Mother adduced insufficient evidence to satisfy her burden of proof; (2) contentions that the trial court abused its discretion in admitting or excluding evidence; and (3) the assertion that the trial court erred in imposing the no-contact order notwithstanding the existing custody order.   We address these categories *seriatim*.[3]

In *Ferko-Fox v. Fox*, 68 A.3d 917, 921 (Pa.Super. 2013), we reiterated, "The purpose of the PFA act is to protect victims of domestic violence from the perpetrators of that type of abuse and to prevent domestic violence from occurring."   The petitioner has the burden of proving by a preponderance of the evidence the allegations of abuse.   *See* 23 Pa.C.S. § 6107(a).   This Court "review[s] the propriety of a PFA order for an abuse

_____

[3] Even though six of Appellant's first seven complaints assail the trial court's evidentiary determinations, we do not review Father's sufficiency claims on a diminished record.   *Commonwealth v. Weaver*, 76 A.3d 562, 569 (Pa.Super. 2013), *appeal granted*, 86 A.3d 862 (Pa. 2014) (law is clear that we are required to consider all evidence that was actually received without consideration as to admissibility of evidence or whether court's evidentiary rulings were correct).

of discretion or an error of law." ***Ferko-Fox***, at 920. Our Supreme Court

has defined abuse of discretion as follows:

> The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

***Commonwealth v. Widmer***, 744 A.2d 745, 753 (Pa. 2000), (quoting

***Coker v. S.M. Flickinger Co.***, 625 A.2d 1181, 1184-855 (Pa. 1993)).

The first category of arguments subsume issues five, eight, nine, ten,

and twelve. Essentially, Father complains that the trial court erred in

concluding that Mother established by a preponderance of the evidence that

he abused her and the children.[4] He asserts that Mother simply proffered

unsubstantiated allegations of his conduct and failed to submit any

documentation, reports, or corroborating witnesses. ***See*** Father's brief at

35. He characterizes Mother's allegations as fraudulent and relies upon

"new extraordinary evidence" that he failed to present during the hearing in

---

[4] To the extent that Father asserts that Mother was required to establish abuse by clear and convincing evidence, he is mistaken. The PFA act's statement on a petitioner's burden of proof is unambiguous, "Within ten business days of the filing of a petition under this chapter, a hearing shall be held before the court, at which the **plaintiff must prove the allegation of abuse by a preponderance of the evidence**." 23 Pa.C.S. § 6107(a) (emphasis added).

an attempt to counter Mother's statements. *Id*. at 36-38. For the following reasons, Father's claims fail.

As noted *supra*, Mother was required to establish the statutory definition of abuse by a preponderance of the evidence, the least demanding evidentiary burden. We previously explained that "the preponderance of evidence standard is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." *Ferri v. Ferri*, 854 A.2d 600 (Pa.Super. 2004) (internal quotation marks omitted). Additionally, the PFA act defines abuse as,

> The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:
>
> (1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.
>
> (2) Placing another in reasonable fear of imminent serious bodily injury.
>
> (3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).
>
> (4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).
>
> (5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings

> commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102(a).

The record belies Father's assertion of error. Instantly, Mother, the maternal grandmother, and eleven-year-old A.K.B. all testified about past episodes of physical abuse, threats, and other behavior designed to place Mother in reasonable fear of bodily injury. For example, in addition to describing the December 4, 2013 episode at Attorney Marks's office, Mother described two other recent events involving Father's course of conduct. First, approximately one week after the December 4, 2013 incident, A.K.B. advised Mother that she had observed Father sitting in his automobile parked across the street from the family's residence. N.T., 12/19/13, at 9. While the child could not observe Father's face from her vantage point, she recognized Father from the interior and exterior of the automobile, brand of cigarettes that he was smoking, and the placement of a tattoo on his forearm. *Id*. at 9. Father took several photographs of the home and left abruptly. *Id*. at 10. Mother inspected the exterior of her home, and since she found nothing out of the ordinary, she declined to report Father to the police for his actions.

In addition, on the day prior to the PFA hearing, A.K.B. informed Mother that Father attended an after-school concert at her school earlier that day. *Id*. She explained that Father sat in the back of the audience

during the concert wearing a hooded sweatshirt. *Id*. Mother also described damage to her door lock that she observed when she was leaving her home the previous morning. *Id*. at 11. Specifically, she testified that the wood around the lock was chipped and the metal lock was dented and misshapen. *Id*. She reported the incident to the police. *Id*.

As it is relevant to whether Father's current conduct was sufficient to induce in Mother a reasonable fear of bodily injury, we review Mother's evidence regarding Father's prior physical abuse of her and the children. In reciting the history of abuse, Mother indicated that Father commonly threatened her with weapons and would use anything nearby when he was angry. *Id*. at 20, 25. The abuse varied from harassing her with a baseball bat to threatening to shoot her in the head with his sidearm. For example, when Mother refused to lie to CYS about Father's second physical assault of one of their children, Father struck her in the face with a telephone, grabbed her by the arms, and shook her. *Id*. at 25. During a later, unrelated ordeal, Father tormented Mother with a baseball bat by swinging the bat but stopping it immediately prior to making contact. *Id*. at 21.

An even more disturbing incident occurred during January 2005, when Father became incensed at Mother following an argument, upended furniture, broke windows, and retrieved his sidearm from its safe. *Id*. at 12. As four of the children were home at that time, Mother immediately called the police. *Id*. at 12, 14. Before the authorities arrived, Father wielded his

gun as he ranted about his hatred for Mother, and he threatened to kill her. *Id*. At one point, Father leveled the firearm at Mother's head from less than three feet away. *Id*. at 12-13. When the police arrived, Father denied brandishing the gun and informed the officers that his sidearm remained locked in the safe. *Id*. at 12. Father further apprised the police officers that he had lost the key to the locked safe. *Id*. at 13. Upon searching him, however, the police discovered the key hidden in Father's wallet. *Id*. When they opened the safe, the gun was missing. *Id*. It was subsequently discovered secreted between the cushions on the living room couch. *Id*. at 13-14. Father was arrested, but he was released on bail the following day. *Id*. at 14.

In addition to his array of weapons, Father has also assaulted Mother with his hands. The first incident of physical abuse occurred during October of 2001, after Mother asked Father to take out the trash. *Id*. at 22. Father was infuriated by the request. *Id*. He cornered Mother in a doorway and beat her with his fists. *Id*. Mother attempted to escape the deluge by sliding down the wall toward the floor but her efforts were futile. Father simply ceased punching her and began to kick her as she knelt on the floor. *Id*. That assault continued for fifteen minutes. *Id*. The following year, Father punched Mother in the right eye during a dispute over money. *Id*. at 23. That assault resulted in a black eye. *Id*.

Again, during February of 2007, while Mother was pregnant with M.B., the third youngest of Father's children, she attempted to leave the family home before another dispute with Father escalated to violence. *Id*. at 19. Father was furious when he discovered Mother packing clothes for her and the children. *Id*. She reassured him, "I'm not leaving [you]. I'm just going [to my mother's] for a little bit. I will be back. I'm not leaving." *Id*. Nevertheless, Father ripped the clothes to pieces, apprehended Mother as she was descending the stairs, and kicked the back of her knee out from under the weight of her body. *Id*. Mother lost her balance and sailed down the steps, struck a wall, and rolled to the floor in front of the children. *Id*. at 20. After viewing the look of horror on her children's faces, Mother lied and told them that she was clumsy and had stumbled accidently. *Id*. at 20. Mother did not report this incident to the police due to her concern for the children and because she felt "they never really helped." *Id*.

In addition to slapping and punching Mother and knocking her down steps, Father also abused Mother with his brute strength. Mother testified about a May 2009 incident wherein she confronted Father regarding his practice of commandeering the car keys and removing the computers and telephones from the home prior to going to work for the day. *Id*. at 16-17. During the ensuing confrontation, Father grabbed Mother's arm and attempted to throw her to the ground. *Id*. at 17. After Mother was able to regain her footing, Father woke all of the children sleeping on a couch in the

- 13 -

room, arranged them in a line, and exclaimed, "let's watch mommy get her ass beat." *Id*. During the ensuing commotion, Mother grabbed Father's uniform shirt for stability and caused one of the buttons to pop off. *Id*. Enraged, Father placed Mother in a submission hold using pressure points behind her ear and on her nose. *Id*. Father also twisted Mother's arms behind her back, raised her wrists above her head, and planted his knee in her back. *Id*. at 17-18. The painful maneuver fractured a bone in Mother's elbow and caused nerve damage. *Id*. at 18. She testified that she was in a cast for more than six weeks following that ordeal. *Id*. at 18-19.

Mindful that she could no longer defend herself and that Father would not discontinue the assault, Mother ceded her protests and let Father leave the home with the keys and communication devices. *Id*. at 18. She testified, "I just laid on the floor until he left." *Id*. Later that evening, after Father returned from work, Mother lulled him into complacency in order to obtain his permission to leave the house with the children. *Id*. at 18. Having successfully escaped from Father's wrath, Mother sought refuge at her mother's home in Philadelphia. *Id.*

Mother stressed that Father abused her regardless of her physical condition. When Mother was was eight months pregnant during 2001, Father attempted to stop her from walking away from him by pulling her leg while she was ascending stairs. *Id*. at 25. Mother fell on her stomach and was admitted to a hospital overnight. *Id*. at 25-26. Similarly, during 2002,

when Mother was nine months pregnant with A.K.B., Father choked her and left a hand print on her neck. *Id*. at 23. More recently, during the summer of 2012, while Mother was approximately five months pregnant with her son from her current relationship, Father pushed her down five steps simply because he was in a bad mood. *Id*. at 15.

Mother also described Father's various assaults of their children. She explained that during 2002, Father smacked one of their daughters in the face, causing a black eye. *Id*. at 23-24. She covered for Father, telling the people attending an ensuing birthday party that the child was clumsy and would bump into things. *Id*. at 24. Again, during 2005, Father smacked a daughter and left a mark on her face. *Id*. Mother's cooperation with CYS following the latter incident led to Father's assault of her with the telephone that we described *supra*. *Id*. More recently, in 2011 Father smacked A.K.B. repeatedly across her face until she curled into a ball on the floor. *Id*. at 28. The offense that Father believed warranted the beating was his daughter's tracking blood around the house after cutting her foot on glass that Father broke and failed to clean. *Id*. The child's wounds required stitches; however, before permitting Mother to take A.K.B. for treatment, Father taunted his daughter by sitting her on the countertop and feigning that he was going to mend the wound with a needle and thread. *Id*. at 29.

In sum, Mother testified that, in light of Father's prior abuse, his current conduct frightens her and raises a concern for the safety of her and

the children. *Id*. at 29. Mother noted that, even after the imposition of the temporary PFA order, Father continued with suspicious behavior like maintaining photographic surveillance of her home, appearing surreptitiously at her daughter's after-school activities, sending intimidating emails, and possibly tampering with her door locks. *Id*. at 26-27, 29.

The maternal grandmother, D.M., also testified during the PFA hearing. Her testimony corroborated Mother's statements regarding the past incidences of physical abuse. *Id*. at 35-43. She characterized Mother's fifteen-year history with Father as brutal. *Id*. at 36. D.M. confirmed Mother's reports of abuse and noted her observations of various choke marks, bruises, black eyes and scratches on Mother and several of the children. *Id*. at 36-37, 39-42. She also reported receiving telephone calls from Mother and hearing Father ranting in the background. *Id*. at 42.

As noted *supra*, eleven-year-old A.K.B. testified *in camera*. She described seeing Father at her after-school concert the previous day. *Id*. at 47. Father's attendance frightened her because she believed "he was going to do something bad." *Id*. A.K.B. also described seeing Father outside of the home. *Id*. She explained, "when I was looking out the window[,] I saw him in the car." *Id*. She continued, "Yeah, I saw him. I was in my room . . . , and I was looking out my window. I saw his white car, and I really thought it was him. He stuck his hand out of the window and took a

picture of the house." *Id*. at 48. A.K.B. also recognized a tattoo on Father's arm. *Id*.

A.K.B. added that, on another occasion, Father told her of his surveillance and described what he observed during a birthday party for one of the children. *Id*. She recounted, "He described the house and [M.B.'s] decorations, how we wrote on the window in marker, Happy Birthday, [M.B.]. He said . . . my stepfather . . . was drinking beer. It wasn't beer. It was an Arizona ice tea from Getty. I said, why didn't you knock? He tried ignoring me and just [asked] other questions." *Id*. at 48. On another occasion Father confided to A.K.B., "I know mom hits you guys and stuff because I see it." *Id*. at 49. When the child inquired further, Father simply responded, "I'm around." *Id*.

Additionally, A.K.B. recalled Father's abuse stating, when Father gets angry, "He hits us and mommy." *Id*. at 49. She testified about the episode where she cut her foot on the broken glass and Father smacked her for crying and making a mess. *Id*. at 50. She added that Father kicked her during the incident and slapped her on the way to the hospital. *Id*. She testified that she was afraid of Father: "I felt like he is going to do it all over again. He is going to – well, try to take us and, you know, hit us again just to get mommy mad or something[.]" *Id*. at 55.

Upon our review of the certified record, we conclude that the trial court did not err in finding that Mother established by a preponderance of

evidence the allegations of abuse as the term is defined in 23 Pa.C.S. § 6102(a). Notably, each of the prior incidents of physical abuse satisfies the definition of abuse under the PFA. Between 2001 and 2012, Father doled out physical abuse liberally. The beatings resulted in an array of injuries. Additionally, Father repeatedly tormented Mother with threats of imminent violence ranging from badgering her with a baseball bat to threatening to shoot her with his sidearm.

In light of the tumultuous history of physical and emotional abuse that Mother and the children endured, Father's stalking behaviors during December 2013, which form the basis of the PFA petition, constituted a course of conduct that placed Mother in reasonable fear of bodily injury. Additionally, although Father was never formally connected to the damage inflicted upon Mother's front door, he admitted to A.K.B. that he conducted surveillance on the home and described events that had occurred therein. In addition, Father stalked Mother outside of the Berks County Courthouse, and he peered through her attorney's office window and watched while she was seeking guidance about how to confront his behaviors. Thus, Mother's evidence was sufficient to sustain the trial court's finding by a preponderance of the evidence that Father committed abuse pursuant to § 6102(a)(5) (engaging in course of conduct, including following the person, under circumstances which place person in reasonable fear of bodily injury).

Moreover, to the extent that Father complains that Mother's evidence was insufficient because it is not supported by documentary evidence, we observe that Mother's testimony alone was sufficient to satisfy her burden of proof. **See Coda v. Coda**, 666 A.2d 741, 743 (Pa.Super. 1995) (petitioner's testimony was sufficient to support protection from abuse order). Furthermore, Father asserts that the trial court erred in disregarding his countervailing evidence concerning the family's dynamic when it was intact and a potential alibi for December 4, 2013. Contrary to Father's contentions, our review of the trial court's determination is highly deferential because the trial court had the opportunity to hear and see the evidence presented. **Hood-O'Hara v. Wills**, 873 A.2d 757, 760 (Pa.Super. 2005). As the trial court exercised its discretion properly in accepting Mother's evidence as more credible than Father's in the case at bar, we will not disturb its decision to enter the PFA order.

The next group of arguments that Father raises in his brief relate to the trial court's evidentiary proceedings. These claims implicate questions one through four, six, and seven. The following principles are relevant to our review.

In **Lykes v. Yates**, 77 A.3d 27, 32 (Pa.Super. 2013) (quoting **Reott v. Asia Trend, Inc.**, 7 A.3d 830, 839 (Pa.Super. 2010)), we explained,

> We note that our standard of review for evidentiary rulings is a narrow one:

> When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

With these principles in mind, we address Father's list of challenges to the court's evidentiary ruling.

Father's first assertion, that the trial court ignored Mother's motivations for filing the PFA petition, is devoid of legal argument and unsupported by case law. In *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010) (*quoting* *Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009)), we reiterated, "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." Thus, Father's first issue is waived. *See also* Pa.R.A.P. 2119(a) (argument section of appellate brief shall contain discussion of issues raised therein and citation to pertinent legal authorities). Moreover, the certified record gives lie to Father's claim that Mother's asserted fear of abuse was pretext. Indeed, as outlined above, Father methodically tormented and physically abused Mother for at least the last thirteen years. Accordingly, his claim that Mother's petition was a ploy to gain an advantage in the child custody proceedings is manifestly without merit.

Next, we address Father's claim that the trial court erred in precluding Father's documentary evidence to support his alibi for December 4, 2013. Father also asserts that the excluded documents established that Mother initiated the PFA proceedings in bad faith. As Appellant failed to provide the trial court with the notes of testimony from the PFA hearing, the trial court was unable to address it directly.

This claim relates to Father's attempt to introduce a computer printout of his check-in and check-out times at SCI Graterford on December 3-6, 2013. The document had a hand-written inscription, allegedly signed by a shift supervisor at the prison, that read "[Father] was at SCI Graterford [on] 12/3 [and] 12/4 until 1600 hrs[.]" Defendant's Exhibit 1. Mother objected to the document's authentication and the trial court barred it for that reason. *See* N.T., 12/19/13, at 121. However, the subsequent Rule 1925(a) opinion did not provide any further explanation for excluding the exhibit because the notes of testimony had not been transcribed when the opinion was issued.

On appeal, however, Mother asserts that the document was inadmissible hearsay. *See* Pa.R.E. 802. Father does not proffer a cogent argument defending against the application of either evidentiary principle. As this Court can affirm the trial court's determination based on any reason supported by the record, and the evidence that Father sought to admit clearly was hearsay, we affirm the trial court's decision to sustain Mother's objection on that basis.

Rule 802 bars hearsay statements offered to prove the truth of the matter asserted unless the statements fit within one of the delineated exceptions in Pa.R.E. 803, 803.1, or 804. Pa.R.E. 801(c) defines hearsay as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Concomitantly, Rule 801(a) explains that a person's written assertion falls within the definition of a statement.

Herein, the printout of Father's start and finish times and his supervisor's inscription are out-of-court statements pursuant to Rule 801(a). Indeed, Father does not dispute this fact nor that he proffered the evidence to prove the truth of the matter asserted, *i.e.*, that he was at work on the times listed on the document. Thus, the evidence falls within the parameters of Rule 802. As the document that Father sought to admit was inadmissible hearsay under Rule 802 and no exception to the rule against hearsay was alleged to apply, no relief is due. The trial court properly excluded Father's out-of-court statement from evidence.

Next, we address Father's claim that the trial court erred in considering evidence of his past physical abuse of Mother and some of the children. His assertion is two-fold. First, Father claims that the allegations that violence occurred between 2004 and 2009 are irrelevant to the current PFA. Second, Father reiterates his overarching complaint that Mother failed

to substantiate her allegations of abuse with documentary evidence. Again, Father's arguments are meritless.

At the outset, we reject Father's latter assertion regarding Mother's evidentiary burden for the reasons we stated above, *i.e.*, Mother's testimony was sufficient to satisfy her burden of proof. **Coda*, supra*. As it relates to Father's contention that the evidence of past abuse was too remote, we observe that, pursuant to Pa.R.E. 402, "[a]ll relevant evidence is admissible," subject to enumerated exceptions and that irrelevant evidence is not admissible. Moreover, evidence is relevant if it has a tendency to make a fact of consequence in the action more or less probable than it would be without it. **See** Pa.R.E. 401. Herein, the evidence that Father assails was relevant to whether he engaged in a course of conduct under circumstances that placed Mother in reasonable fear of bodily injury.

In PFA proceedings, evidence of past abuse not only is relevant, but it is crucial for the trial court's determination. **See Buchhalter v. Buchhalter**, 959 A.2d 1260 (Pa.Super. 2008). In **Buchhalter**, this Court addressed a similar issue and held that a trial court erred in barring the petitioner's testimony regarding prior abuse. **Id**. at 1263. Concluding that "[t]he facts surrounding the prior PFA consent order are relevant to an understanding as to the reasonableness of [the petitioner's] fear relative to the present petition[,]" we reiterated,

> In light of the protective purposes of the act, it was within the
> trial court's discretion to hear any relevant evidence that would

- 23 -

assist it in its obligation to assess the appellee's entitlement to and need for a protection from abuse order. If the trial court found the testimony to involve events too distant in time to possess great relevance to the case, it could certainly have assigned less weight to the testimony. However, it was not an abuse of discretion for the trial court to hear the evidence. Past abusive conduct on the appellant's part was a crucial inquiry necessary for entry of a proper order.

*Id*. (quoting *Raker v. Raker*, 847 A.2d 720,726 (Pa.Super. 2004)).

Thus, based on these principles, we find the evidence of the family's history of physical violence relevant and therefore admissible. As we explained in *Buchhalter*, *supra*, evidence of Father's past physical abuse established a contextual foundation that was necessary to understand the reasonableness of Mother's fears relative to the instant petition. Accordingly, the trial court did not err in considering it.

Next, we address Father's contention the trial court abused its discretion in permitting A.K.B.'s *in camera* testimony. Father argues that the court erred in failing to hold a competency hearing prior to considering her testimony, which he asserts that Mother tainted. He also avers prejudice as a result of being excluded when the eleven-year-old child testified *in camera*.

In addition, Father's brief challenges the trial court's admission of Attorney Marks's testimony as a fact witness regarding the incident that occurred outside of her law office on December 4, 2013, and her in-court identification of Father as wearing the same jacket as on the date in

question. Noting that Attorney Marks is an officer of the court, Father challenges the propriety of the trial court's decision to permit her testimony.

None of Father's claims warrants relief. Father failed to object during the hearing to testimony of A.K.B. or Attorney Marks. Pursuant to Pa.R.A.P. 302, "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Instantly, Father's failure to level any objections to the witnesses' testimony deprived the trial court of an opportunity to confront the issue and remedy any perceived prejudice. As Father failed to raise these claims during trial, they are waived and we will not address them herein.

The final class of argument raised in Father's brief relates to the PFA order's three-year no-contact directive. This claim implicates issue eleven. Father does not call upon the interplay between the PFA order and the existing order that previously governed the child custody arrangement. Instead, he simply argues that Mother failed to prove that he physically abused the children. Father's brief at 40. Father's claim fails.

The certified record establishes that the children not only watched Father physically abuse Mother and witnessed him threaten Mother with his sidearm, but at least two of the four children were subject to Father's physical abuse. N.T., 12/19/13, at 14, 23-25, 29, 49-50. The evidence reveals that he twice gave the oldest child black eyes by slapping her in the face, and he hit A.K.B. on multiple occasions. *Id*. at 23-24, 39-42.

Moreover, Father struck Mother when she was pregnant with several of the children, and the maternal grandmother testified that she observed various bruises and scratches on the children over the prior ten years. *Id*. at 15, 19, 23, 25, 36-37, 39-42. Finally, we observe that CYS imposed supervised visitation between Father and the children based upon its concern over the prior allegations of abuse. *Id*. at 100, 116-117. As the record supports the trial court's finding that Father's conduct created a reasonable fear of danger to the children, we will not disturb it.[5]

Finally, we address the deferred portion of Father's self-styled motion for intervention. As noted *supra*, Father purports to invoke "new extraordinary evidence" in the form of a time-stamped video recording of the shift change at SCI Graterford on December 4, 2013. He argues that the video establishes conclusively that he was at that facility at 3:54 p.m. on December 4, 2013, and therefore could not have stalked Mother outside of Attorney Marks's office. Father continues that the testimony presented by Mother and Attorney Marks was tantamount to perjury and further demonstrated that Mother prosecuted the PFA proceedings in bad faith. For the following reasons, we disagree with all of Father's contentions.

_____

[5] Although Father does not challenge the propriety of the no-contact directive in light of the existing custody order, we observe that the PFA act permits trial courts to obstruct an abuser's physical custody of his children when the record supports the trial court's finding that he abused the children or poses a risk of abuse. 23 Pa.C.S. § 6108(a)(4)(i)(A) and § 6108(a)(4)(iii)(B).

First, although Father styled the excerpt of a video recording from the SCI security camera as new evidence, he cannot explain why he was unable to obtain that evidence prior to the PFA hearing. Indeed, while Father proffered fact witnesses, introduced turnpike receipts, and sought to introduce a computer printout of his start and finish times, he failed to mention the existence of relevant surveillance footage. It is apparent from these facts that Father's evidence is not new. In actuality, the evidence existed prior to the evidentiary hearing and Father simply failed to present it. Father cannot claim evidence is new merely because he failed to present it to the trial court in the first instance. Thus, no relief is due.

Furthermore, even if Father presented the surveillance excerpt during the evidentiary proceedings and attempted to introduce it into evidence, he would have encountered similar obstacles to its omission that he was unable to overcome in relation to the time sheet. That is to say, it would be inadmissible pursuant to Pa.R.E. 901 for lack of authentication. Pointedly, we observe that while Father asserts that the video depicts his exit from the facility at 3:55 p.m., he fails to identify any extrinsic evidence to authenticate that the recording is what he purports it to be. Under Pennsylvania jurisprudence, demonstrative evidence like an excerpt from a surveillance video "must be authenticated by evidence sufficient to support a finding that the demonstrative evidence fairly and accurately represents that which it purports to depict." **See** Comment Rule 901(a) (citing **Nyce v.**

***Muffley***, 119 A.2d 530 (Pa. 1956). Instantly, the excerpt from the surveillance video is not self-authenticating, nor does Father identify any witnesses with sufficient knowledge of the recording procedure to verify that the excerpt is what he purports it to be.

Moreover, the significance of the lack of authentication is highlighted by the fact that, upon viewing a copy of the surveillance recording that is contained in the certified record, we were unable to confirm if any of the male correctional officers recorded leaving the secured portion of the facility prior to 3:55 p.m. was Father. Father's appearance in the video excerpt is not self-evident and he does not provide any mechanism for this Court to identify him from the throng of people exiting the facility at the pertinent time. For instance, Father could have indicated the precise time that he entered the frame of the excerpt or described himself by the uniform color, hairstyle, or other identifying attribute. He failed to do any of these things. At best, the excerpt reveals eight unidentified males leaving the facility at the pertinent time. Absent some extrinsic evidence, it is impossible to determine whether any of the male correctional officers is Father. Thus, despite Father's protestation to the contrary, the excerpt from the SCI Graterford surveillance camera does not definitively establish that he was at the facility on the date and time in question. Accordingly, for all of the foregoing reasons, upon review of the deferred aspect of Father's motion for

intervention regarding new extraordinary evidence, we deny his request to vacate the PFA based on the video recording.

Order affirmed. Motion for intervention denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/9/2014