J-A01042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| T.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| K.W. | : | |
| | : | |
| Appellant | : | No. 854 MDA 2021 |

Appeal from the Order Entered May 28, 2021
In the Court of Common Pleas of Lackawanna County Civil Division at
No(s):  2021-40485

BEFORE: LAZARUS, J., NICHOLS, J., and KING, J.

MEMORANDUM BY NICHOLS, J.:               **FILED:  FEBRUARY 1, 2022**

Appellant K.W. appeals from the order granting Appellee T.G.'s petition for a final protection from abuse order under the Protection From Abuse (PFA) Act.[1]  Appellant contends there was insufficient evidence that he abused the parties' minor child (Child)[2] and threatened Appellee by displaying his gun when the parties exchanged custody of Child.  We affirm.

We adopt the facts and procedural history set forth in the trial court's opinion. ***See*** Trial Ct. Op., 9/21/21, at 2-7.  Briefly, the parties are unmarried and share physical custody of Child.  R.R. at 82a.[3]  Appellee filed a petition for

---

[1] 23 Pa.C.S. §§ 6101-6122.

[2] Child was born in May of 2015.

[3] We may cite to the reproduced record for the parties' convenience.

protection from abuse on April 28, 2021. *Id.* at 81a-87a. At the final PFA hearing, Appellee testified that Child had a black eye, which she photographed that day, after returning from Appellant's home. *Id.* at 4a. Child did not immediately disclose who gave him the black eye. *Id.* at 9a. It was between a week and a week-and-a-half later that Child told Appellee that it was Appellant and his paramour who beat Child for urinating on himself. *Id.* at 29a-30a. Appellee also testified that when she exchanged custody of Child, she was scared because Appellant would walk out of the house with the gun displayed. *Id.* at 9a-10a, 27a-28a.

Gerald Pender from Luzerne County Children and Youth Services (CYS), among other witnesses, also testified. Mr. Pender testified that he investigated the alleged abuse of Child and concluded it was unfounded but acknowledged that Child stated he feared Appellant. *Id.* at 43a, 45a-46a. Appellant also testified, and he denied injuring Child and brandishing his gun. *Id.* at 56a, 66a. Appellant also discussed a text message he sent to Appellee in which he stated he would beat Child "every time he does something wrong" and that Child "didn't have a black eye when he left." *Id.* at 69a.

On May 28, 2021, the trial court granted the final PFA order, which was a "no hit" PFA.[4] On June 28, 2021, Appellant timely appealed and voluntarily filed a non-court ordered Pa.R.A.P. 1925(a)(2) statement.[5]

Appellant raises the following issues:

1. Whether the trial court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that [Child's] injuries were caused by Appellant.

2. Whether the trial court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that [A]ppellant has ever abused [Child].

3. Whether the trial court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that Appellant made any threats to [Appellee] by means of firearms.

Appellant's Brief at 6.

We summarize Appellants' arguments together. Appellant identifies evidence that in his view contradicted Appellee's evidence that Appellant gave Child a black eye. *See id.* at 16-17. For example, Appellant claims that Appellee did not comment about Child's injury when the parties exchanged

_____

[4] According to the hearing, a custody court cannot modify a "no contact" PFA but can modify a "no hit" PFA. R.R. at 77a. The instant trial court reasoned that because it wanted to permit the parties' custody court to modify the PFA as necessary, it would make the PFA order a "no hit" PFA. *Id.* Unlike a "no contact" PFA, a "no hit" PFA permits some contact but not threats or harassment. *See id.*

[5] On July 7, 2021, the trial court ordered Appellant to comply with Rule 1925(a)(2) within twenty-one days. Order, 7/7/21. Appellant did not file another Rule 1925(a)(2) statement. Because Appellant filed his Rule 1925(a)(2) statement with his notice of appeal, we do not find waiver.

custody of Child. *Id.* at 16-19. Appellant emphasizes that CYS conducted an investigation and concluded that "the finding of abuse of [Child] was 'unfounded' by the alleged perpetrator, that being Appellant." *Id.* at 17. Appellant reiterates that in his view, CYS did not find Child's and Appellee's claims credible and therefore no evidence supports a finding that he abused Child. *Id.* at 19.

Appellant similarly contends that although testimony established he brought a firearm when exchanging Child, "[n]owhere in the testimony [did] Appellee explain how Appellant used a firearm for the purposes of threatening her." *Id.* at 20. Appellant asserts there was no corroborating evidence that he used "a threatening tone towards Appellee." *Id.*[6]

> We are guided by the following law:
>
> Our standard of review for PFA orders is well settled. In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion.
>
> The PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence. A preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, enough to tip a scale slightly.
>
> When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review

---

[6] We note that Appellant fails to cite any specific authority in his argument. Rather, Appellant repeatedly cites "23 Pa.C.S. § 6101 *et seq.*" generally. **See** Appellant's Brief at 16, 17, 19, and 21. Appellant did not cite or discuss any other legal authorities in his argument.

the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

In relevant part, the PFA Act defines abuse as the occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

[(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury . . . .

(2) Placing another in reasonable fear of imminent serious bodily injury.

\* \* \*

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses)].

The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse. In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury. Past acts are significant in determining the reasonableness of a PFA petitioner's fear.

*E.K. v. J.R.A.*, 237 A.3d 509, 519 (Pa. Super. 2020) (citations omitted and

formatting altered). This Court has also stated that the purpose of the PFA

Act is to "prevent imminent harm to abused person(s) . . . ." ***Buchhalter v. Buchhalter***, 959 A.2d 1260, 1263 (Pa. Super. 2008) (quoting ***Miller v. Walker***, 665 A.2d 1252, 1259 (Pa. Super. 1995) (additional citation omitted)). In resolving whether a PFA petitioner reasonably fears imminent serious bodily injury, the defendant's "intent is of no moment." ***Raker v. Raker***, 847 A.2d 720, 725 (Pa. Super. 2004).

Relatedly, this Court has held that a "PFA petitioner is not required to . . . introduce medical evidence of an injury. The petitioner's testimony is sufficient if it is believed by the trial court." ***Custer v. Cochran***, 933 A.2d 1050, 1058 (Pa. Super. 2007) (*en banc*) (citations omitted). Finally, this Court has "clear[ly] pronounce[d] that the PFA Act broadly defines abuse to allow a petitioner to obtain protection from abuse that may not rise to the level of abuse required for action under the Child Protective Services Law . . . ." ***Viruet ex rel. Velasquez v. Cancel***, 727 A.2d 591, 595 (Pa. Super. 1999).

For example, in ***Miller***, the PFA petitioner alleged that the defendant had hit the parties' minor child with a paddle, bruising the child's leg and arm. ***Miller***, 665 A.2d at 1254. At the final PFA hearing, the trial court heard testimony from the parties and the child and reviewed several photographs of the child's bruises taken a day later. ***Id.*** at 1255-56. The trial court issued the PFA, reasoning that the defendant's testimony was not credible and that the record established bodily injury to the minor child. ***Id.*** at 1256. The defendant appealed, arguing that the "credible evidence did not establish

bodily injury . . . ." *Id.* (formatting altered). The *Miller* Court affirmed, reasoning that it must defer to the trial court's credibility determination, and the record, including the photographs of the child's bruising, established bodily injury to justify a PFA. *Id.*

In *E.K.*, the defendant made a social media post, which the PFA petitioner construed "as a threat to harm her physically." *E.K.*, 237 A.3d at 515. The petitioner filed a PFA petition, and the trial court, following a final PFA hearing, granted the petition. *Id.* at 513, 517. The trial court reasoned that the record established that the defendant knew the post was threatening and intended the post to be seen by the petitioner. *Id.* at 520; *cf. Raker*, 847 A.2d at 725 (stating the defendant's "intent is of no moment"). The defendant appealed, challenging whether the petitioner "failed to demonstrate that she had a reasonable fear of imminent serious bodily injury . . . ." *E.K.*, 237 A.3d at 520. The *E.K.* Court affirmed, reasoning that the trial court did not abuse its discretion by holding that the petitioner "had a reasonable fear of imminent serious bodily harm", equating harm with injury. *Id.*; *see also Buchhalter*, 959 A.2d at 1263 (stating purpose of the PFA Act is to "prevent imminent harm" (citations omitted)).

Here, the instant facts are similar to the facts in *Miller*, which also involved the parties' minor child, contemporaneous photographs of the child's bruises, and conflicting testimony by the parties. *See Miller*, 665 A.2d at 1255-56. The trial court viewed the photograph of Child's bruise and held that

Appellee's testimony was more credible than Appellant's testimony. *See E.K.*, 237 A.3d at 519; *Custer*, 933 A.2d at 1058. To the extent Appellant relies on Mr. Pender's testimony that the allegation of abuse was unfounded, the "PFA Act broadly defines abuse to allow a petitioner to obtain protection from abuse that may not rise to the level of abuse required for action under the Child Protective Services Law . . . ." *See Viruet*, 727 A.2d at 595.

Finally, similar to the threatening post in *E.K.*, Appellee testified she was scared when Appellant displayed his gun when they exchanged custody of Child, such that she "had a reasonable fear of imminent serious bodily injury". *See* R.R. at 9a-10a; *E.K.*, 237 A.3d at 520. Although Appellant denied brandishing a gun, it was for the trial court to resolve the parties' conflicting testimony and the trial court believed Appellee's testimony over Appellant's testimony. *See E.K.*, 237 A.3d at 519. Further, Appellant's "intent is of no moment." *See Raker*, 847 A.2d at 725.

For these reasons, after viewing the record in the light most favorable to Appellee, because we find no error of law or abuse of discretion by the trial court in granting the PFA petition in favor of Appellee and Child, we affirm. *See E.K.*, 237 A.3d at 519.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/01/2022

T.G.,

     Plaintiff

v.

K.W.,

     Defendant

MAURI B. KELLY
LACKAWANNA COUNTY

2021 SEP 21  A 11: 20

CLERK OF JUDICIAL
RECORDS OF FAMILY
COURT DIVISION

IN THE COURT OF COMMON PLEAS
OF LACKAWANNA COUNTY

CIVIL ACTION – LAW
PROTECTION FROM ABUSE

:

:

:

:

:

:

:

No. 2021-FC-40485

## <u>OPINION PURSUANT TO PA.R.A.P. 1925</u>

JARBOLA, J.

### I.    INTRODUCTION

Plaintiff, T.G. (hereinafter Mother), filed a petition for Protection from Abuse in the above-captioned action against Defendant, K.W. (hereinafter Father), the Appellant herein, listing minor child R.W. (D.O.B. 5/23/15) as a protected party. A hearing occurred on Plaintiff's Petition on May 28, 2021. On June 28, 2021, Father filed his timely Notice of Appeal and Concise Statement of Errors/Matters Complained of, raising the following grounds:

a. The Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that the minor child's injuries were caused by Defendant;

b. The Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that Defendant has ever abused the minor child;

c. The Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that Defendant made any threats to Plaintiff by means of firearms;

RR 92

d. The Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that Defendant made any threats and/or physical contact with the Plaintiff.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The parties are unmarried but share a six-year-old child, R.W. (D.O.B. 5/23/15). (Petition for Protection from Abuse, filed 04/28/2021). Mother filed a petition for Protection from Abuse (PFA) against Father on April 28, 2021, requesting temporary custody of the minor child, requesting Father relinquish all firearms and that the PFA prohibit all contact between the parties. Id. This Court entered a temporary PFA per Mother's request and a hearing was scheduled for May 12, 2021. (Order, J. Jarbola, filed 04/28/2021). Mother's Temporary Order was extended at the May 12, 2021 hearing and a Final PFA Hearing was scheduled before this Court for May 28, 2021. (Order, J. Mazzoni, filed 05/12/2021).

As the parties could not reach agreement, this Court conducted a hearing during the scheduled May 28, 2021 court date, at which Mother, Father, and Luzerne County Children and Youth Services testified. (See generally N.T, 5/28/21). Both parties were represented by counsel. Id.

At the outset of the hearing, Mother argued that she filed for a Order after she observed a black eye on the minor child following his return from Father's home on December 24, 2020.[1] (N.T, 5/28/21, pp. 5). She stated that she questioned the minor child about the injury; however, the minor child would not disclose the circumstances of the injury to Mother until roughly a week and a half to two weeks later. Id. at 10. Ultimately, the minor child told Mother that Father and his paramour beat him because he urinated on himself. Id. at 31. Mother stated that

---

[1] Mother testified that the parties were primarily operating under an informal custody arrangement. (N.T, 5/28/21, pp. 4-5).

2

RR 93

she did report the incident to the local police department and took a photograph of the injury. Id. at 5, 8-10.

Mother also testified that Father kept firearms in his home and would brandish his weapons to invoke fear from Mother during those custodial exchanges that occurred at Father's home. Id. at 11. She explained that Maternal Grandfather generally attended the aforementioned custodial exchanges to act as a mediator. Id at 4-5. Mother argued that she is in fear of Father and eventually moved from her residence in Carbondale to Scranton due to Father's intimidation tactics; she relayed that Father "[is] always threatening. He's always threatening, like, he's going to get somebody to handle me or I'm going to be dealt with." Id. at 12-13.[3] Mother also stated that Father put a "status" on Facebook directing his Facebook "friends" to look out for Mother and that Father's friends showed up at Mother's residence in Carbondale, threatening her at Father's direction. Id. Lastly, Mother testified that Father's cousin texted her from a private number demanding she return the minor child to Father "or else." Id. at 13.

On cross-examination, Father's counsel questioned Mother about the events that occurred prior to her filing for a PFA. Id. at 14-15. Mother explained that the police were at her house on April 27, 2021 and told her that there was a current Court Order directing her to turn the minor child over to Father. Id. Father's attorney clarified that an Emergency Custody Order was issued on March 11, 2021, by Judge Rogers in Luzerne County, Pennsylvania, directing that the minor child be turned over to Father, pending a hearing on March 29, 2021. Id. at 17. Defendant's counsel stated that he tried to effectuate service of said Order on several occasions and ultimately contacted Mother himself, via telephone, prior to the start of the March 29, 2021 hearing. Id. at 18-19. Mother did not attend the March 29, 2021 hearing. Id. at 20. Mother

---

[3] Mother clarified that Father's threats have been both via telephone and in-person and that he showed up at her Scranton residence without any knowledge as to how he could have obtained that address. (N.T. 5/28/21, pp. 40).

3

BR 94

indicated that she asked Father's attorney for a better understanding of what the scheduled hearing was about and told him that she was leery to talk to him because he was not the first person to contact her on behalf of Father claiming to be an attorney. Id. Mother stated that she ultimately referred Father's counsel to the Nanticoke Police Department regarding the current custodial situation. Id.[3]

Father's counsel then questioned Mother about the picture she took of the minor child's black eye. Id. at 21. Mother testified that she texted Father on December 28, 2020 regarding the minor child's injury and then forwarded a picture of the same to Father in early January 2021. Id. at 24. Father's counsel presented pictures of the minor child on the morning of December 25, 2020, claiming there was no visible injury to the minor child; however, the Court indicated that it could "see something on the left cheek area." Id. at 26. Mother clarified that the minor child's marks did not come from the other children living in Mother's home (minor child's older siblings). Id. at 27-28.

Mother was also questioned about an alleged agreement that she and Father had previously made regarding custody of the minor child. Id. at 38. She stated that the parties agreed that the minor child was going to exclusively live with Mother once he was old enough to begin school around five or six years old. Id. She stated that said conversation occurred roughly one month before she discovered the minor child's black eye. Id. at 38.

Following Mother's testimony, Father's attorney called Gerald Pender of Luzerne County Children and Youth Services, an intake worker for Child Protective Services, to testify. Id. at 43. Caseworker Pender testified that allegations regarding the minor child came in on January 6,

---

[3] Mother testified that Lackawanna County Office of Youth and Family Services additionally came to her home regarding the Emergency Custody Order; Mother also referred them to Nanticoke Police Department and they left Mother's residence without removing the minor child. (N.T, 5/28/21, pp. 21).

4

RR 95

2021; Father and his paramour were named as the alleged perpetrators. Id. at 44. Caseworker Pender stated that during the investigation, he interviewed Mother, Father and Father's paramour and that the minor child was interviewed at the Child Advocacy Center (CAC). Id. at 44-45. Following the child's interview, Caseworker Pender unfounded the allegations, stating that the timeline of the December 24, 2020 photograph and the minor child's narrative did not match up. Id. at 45, 47. He explained that the minor child disclosed to the CAC interviewer that he was afraid of Father and his paramour and that he was beaten with a belt; however, there were no marks on the minor child's body to indicate the same. Id. at 46-48. The minor child told the CAC that he had wet his underwear and, while he was being cleaned up, Father's paramour picked him up and hit him with her hand and then Father hit him with a belt. Id. at 51-52. Caseworker Pender stated that he believed that there was a lack of physical abuse. Id. As that was the case, Caseworker Pender did not refer the matter to law enforcement. Id. at 46.

The final witness to testify at the May 28, 2021 hearing was Father. Id. at 53. Father testified that the last time he and Mother lived together was in New Jersey, just after the minor child was born. Id. at 53-54. He stated that, once they separated, the New Jersey Court entered a Custody Order in 2017 granting him primary custody. Id. at 54. He testified that Mother's periods of partial custody with the minor child have been sporadic since 2017 and, in 2020, Mother only had custody of the minor child four times. Id. at 55. He detailed that the longest period that Mother kept the minor child before returning him to Father was two weeks. Id. He additionally stated that Mother reached out to him and requested that the minor child stay with her over the 2020 Christmas Holiday. Id. at 56. Father alleged that, at that time, he was unaware of where Mother was residing. Id.

5

RR 96

Regarding the minor child's disclosure that Father beat him with a belt, Father testified to the Court that he doesn't even own a belt, as described by Mother, and hasn't for years. Id. at 57. He also claimed that the extent of his physical discipline toward the minor child is giving him a "pop on his butt" and that he is having issues with the minor child wetting his bed. Id. at 58. Father stated that when the minor child wet his bed, Father did not physically discipline him but rather spoke to him calmly. Id. Father went on to explain that the minor child has Sickle Cell Anemia which leads to dehydration issues and that the minor child constantly is drinking throughout the day. Id. at 58-59.[4]

On cross-examination, Father was questioned about a text message he sent Mother wherein he stated ". . . when I'm with my child that I'm raising, he's going to get his ass beat every time he does something wrong. . . he didn't have a black eye when he left. You would have seen it. . . ." Id. at 70. Father argued that Mother appreciates when Father disciplines the minor child but clarified that he only uses physical discipline when the minor child's behavior is drastic and that most of the time he simply sits down and talks to him. Id. at 71-72.

Father also testified that he was under the impression that the New Jersey Court Order, granting Father physical custody, was still in effect. Id. at 62. He stated that, pursuant to that Order, he demanded the return of the minor child. Id. When Mother did not return the minor child, Father then filed a Petition for Emergency Special Relief in Luzerne County on or about March 11, 2021 and hired a Constable to effectuate service. Id. When Father and the Constable showed up at Mother's address in Luzerne County, she had already moved to Scranton. Id. at 63. Father stated that he was then served with Mother's PFA Petition on or about April 27, 2021 and that, as a result of that petition, Father's firearms were confiscated. Id. at 66.

---

[4] Minor child sees a doctor in Danville, Pennsylvania, regarding his Sickle Cell Anemia diagnosis. (N.T. 5/28/21, pp. 59).

6

RR 97

Regarding said firearms, Father argued that he never brandished a weapon or used it in a threatening manner against Mother. Id. Father stated that he has a valid conceal and carry permit and that he believes Mother and Maternal Grandfather must have seen the firearm one time at a custody exchange. Id. at 66-67. Father contended that Maternal Grandfather even inquired into where Father obtained the firearms and what the procedure was surrounding the same. Id. at 67. Mother responded that the only conversation Maternal Grandfather had with Father was asking him why he even needed a firearm and why it would need to be displayed during a custody exchange. Id. at 76.

At the conclusion of the hearing, the Court granted Mother a three-year, no-hit PFA (with the minor child as a protected party) and stated that if Father wanted to seek reconsideration of the custody, he should file the appropriate paperwork. Id. at 77-80. Father, the Appellant in the instant matter, filed a Notice of Appeal and Concise Statement of Errors Complained Of on June 28, 2021.

## III. DISCUSSION

### a. The Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that the minor child's injuries were caused by Defendant.

The Protection from Abuse (PFA) Act's primary purpose is "to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *Buchhalter v. Buchhalter*, 959 A.2d 1260, 1262 (Pa.Super. 2008).

7

RR98

The PFA Act, 23 Pa.C.S. §§ 6101–6122, defines "abuse," as:

"**Abuse.**" The occurrence of one or more of the following acts
between family or household members, sexual or intimate partners
or persons who share biological parenthood:

> (1) Attempting to cause or intentionally, knowingly or recklessly causing
> bodily injury, serious bodily injury, rape, involuntary deviate sexual
> intercourse, sexual assault, statutory sexual assault, aggravated indecent
> assault, indecent assault or incest with or without a deadly weapon.
>
> (2) Placing another in reasonable fear of imminent serious bodily injury.
>
> . . . .

Ultimately, a "plaintiff must prove the allegation[s] of abuse by a preponderance of the evidence." *See* 23 Pa.C.S. §§ 6107. Further, "it is for the trial court to assess the credibility of witnesses, and, if its findings are supported by competent evidence, a reviewing court is bound thereby." *Coda v. Coda*, 666 A.2d 741, 743 (Pa.Super. 1995).

In the instant matter, Father argues that there was not sufficient evidence to support a finding that he was responsible for the minor child's injuries. This Court disagrees. Mother in the instant matter testified that the minor child returned to her home, following a visit with Father, with a black eye. (N.T, 5/28/21, pp. 5). She indicated that the minor child told her that the injury occurred because Father and his paramour beat him after he urinated on himself. Id. at 31. Mother stated that she reported the incident to the local police department, took a photograph of the injury and questioned Father about the same. Id. at 5, 8-10, 24. This Court, after viewing the photograph taken by Mother, indicated that it did see discoloration on the

8

RR99

child's left cheek. Id. at 26. Mother detailed that the minor child's marks did not come from the minor child's older siblings. Id. at 27-28.

Father testified that he is in fact having problems with the minor child wetting his bed and admitted to using physical discipline on the minor child but Father claimed that the extent of the same is giving him a "pop on his butt." Id. at 58. Mother's attorney rebutted Father's statement with a text message Father sent to Mother stating ". . . when I'm with my child that I'm raising, he's going to get his ass beat every time he does something wrong. . . he didn't have a black eye when he left. You would have seen it . . ." Id. at 70.

This Court ultimately determined that Mother's testimony, coupled with the photographs of the minor child's injury, as well as Father's statement to Mother via text message, was more credible than Father's in granting the PFA. Additionally, there is no requirement that Father be physically responsible for the minor child's injuries in order for the Court to issue a PFA. The mere fact that Father placed the minor child in reasonable fear of imminent harm is sufficient to warrant the issuance of a Protection from Abuse Order. Mother relayed to the Court that the minor child did not disclose the circumstances surrounding his injury immediately as "he was scared" – a statement confirmed by the Luzerne County Children and Youth Services worker (N.T, 5/28/21, pp. 10, 46). Father himself testified on cross-examination that ". . . when I'm with my child that I'm raising, he's going to get his ass beat every time he does something wrong. . ." Id. at 70. Father testified that the minor child is having bed-wetting issues and that Mother appreciates when Father disciplines the minor child. Id. at 58, 71-72. Per the parties' testimony as well as this Court's determination that Mother presented as the more credible witness, this Court asks that its ruling on this matter be affirmed.

9

RR100

**b. The Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that Defendant has ever abused the minor child.**

As discussed in the analysis above in subsection (a), this Court is of the opinion that whether or not Defendant physically abused the minor child, there is sufficient evidence for the issuance of a PFA and, as such, this Court asks that its ruling on this matter be affirmed.

**c. The Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that Defendant made any threats to Plaintiff by means of firearms.**

"When a claim is presented on appeal that the evidence was not sufficient to support an order . . . [the Appellate Court] review[s] the evidence in the light most favorable to the petitioner and grant[s] her the benefit of all reasonable inference. . ." *Raker v. Raker*, 847 A2d 720, 724 (Pa. Super. 2004) (quoting *Fonner v. Fonner*, 731 A2d 160, 161 (Pa. Super. 1999). Further, "[i]n the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury . . . Appellant's intent is of no [concern]." *Raker* at 725. In the instant matter, this Court is of the opinion that Defendant's exposure of his firearm was a threat to Plaintiff.

In *Raker*, the Plaintiff alleged that when Defendant was involved in a scuffle with her son-in-law, she observed a knife fall out of the Defendant's pocket, placing her in reasonable fear of imminent bodily injury. Id. at 722-723. The Court in Raker determined that there was a "clearly volatile history between the parties" that, when coupled with the events alleged by the Plaintiff, would justify the Plaintiff fearing bodily injury at the hands of the Defendant. Id. The parties in that case gave conflicting testimony regarding whether Defendant actually had a knife; however, "[d]efendant did acknowledge that he was carrying a sixteen-penny spike at the time of the scuffle." Id. at 723-724.

10

RR 101

In the matter on appeal before this Court, there is also a volatile history between the parties. Father testified that he has had custodial issues with Mother while Mother testified that she eventually moved from her residence in Carbondale to Scranton due to Father's intimidating and threatening behavior. (N.T., 5/28/21, pp. 12-13; 62-66).

Likewise, as in *Raker*, the parties in the instant matter presented conflicting testimony as to whether Defendant ever brandished a weapon during custodial exchanges with the minor child. Mother argued that Father would brandish his weapon to invoke fear during custodial exchanges and that she had to bring her father (Maternal Grandfather) along as a mediator. Id. at 11; 4-5. Father argued that he never brandished a weapon or used it in a threatening manner against Mother. Id. at 66. Father stated he has a valid conceal and carry permit and that Mother and Maternal Grandfather must have seen the firearm one time at a custody exchange. Id. at 66-67.

As indicated above, this Court finds that Father's beliefs or intentions regarding the firearm are irrelevant here. The parties' tumultuous history, coupled with ongoing threats made to Mother, clearly placed Mother in reasonable fear of an imminent bodily injury when she observed Defendant's weapon and as such, this Court asks that its ruling on this matter be affirmed.

d. **The Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidence to support that Defendant made any threats and/or physical contact with the Plaintiff.**

As discussed in the analysis above in subsection (c), this Court is of the opinion that, although Defendant did not make physical contact with Plaintiff, there is sufficient evidence to support a finding that Defendant did threaten the Plaintiff and, as such, this Court asks that its ruling on this matter be affirmed.

11

RR102

## IV. CONCLUSION

For the foregoing reasons, this Court finds that each of Appellant's claims fails for lack of legal and/or factual support and that there was sufficient evidence to warrant the issuance of a Protection from Abuse Order pursuant to the Protection from Abuse Act, 23 Pa.C.S. §§ 6101–6122. As such, for the foregoing reasons, this Court's Order reflecting the same in the above-docketed matter should be affirmed.

BY THE COURT:

_____, J.
ANDREW J. JARBOLA, III

*Written notice of the entry of the foregoing Opinion has been provided to each party pursuant to Pa.R.C.P. 236(a)(2) by mailing time-stamped copies to:*

Attorney for Plaintiff:
Dyan Dintsell, Esquire
33 N. Main Street, Suite 200
Pittston, PA 18640

Attorney for Defendant/Appellant:
Tullio DeLuca, Esquire
Law Office of Tullio DeLuca
381 N. 9th Avenue
Scranton, PA 18504

12

RR103