**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| OLUSEUN WERT O/B/O L.S.W. AND L.O.W., MINOR CHILDREN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 176 EDA 2024 |
| MARGARET WERT | : | |

Appeal from the Order Entered December 13, 2023
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2023-PF-1493

BEFORE:  DUBOW, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY DUBOW, J.:                **FILED OCTOBER 17, 2024**

Appellant, Oluseun Wert ("Mother"), appeals from the December 13, 2023 order entered in the Lehigh County Court of Common Pleas that denied the Petition for Protection From Abuse ("PFA") that Mother filed on behalf of herself and her children against Appellee, Margaret Wert ("Paternal Grandmother" or "PGM") pursuant to the PFA Act, 23 Pa.C.S. §§ 6101-6122. Upon careful review, we affirm.

Mother and Joshua Wert ("Father") are parents to seven-year-old L.W. ("Child 1") and five-year-old L.W. ("Child 2") (collectively, "Children").  The parties are involved in contentious divorce and custody proceedings.  Paternal Grandmother has helped watch Children since they were born and is involved in custody exchanges.

On December 6, 2023, Mother filed a PFA petition against Paternal Grandmother alleging that on October 24, 2023, at the parties' former marital home, Father and Paternal Grandmother had a threatening discussion following a child support hearing.[1]  Mother specifically alleged:

> [Paternal Grandmother] made a comment about getting me jumped or taking out a hit on me within [C]hildren's hearing.  The conversation continued in the presence of our [then] 6-year-old son stating that I just don't understand who I'm messing with, and that they will be "stealth about it."

PFA Petition, 12/6/23, ¶ 11.  Mother also alleged that Children did not want to go with Paternal Grandmother during a November 27, 2023 custody exchange, causing her to be concerned for their safety:

> [Paternal Grandmother] came to pick up [Children] for [Father]'s custody, repeatedly ringing the doorbell and both [C]hildren refused to go with her, choosing instead to run and hide.  One screamed and cried throughout the exchange, and [Paternal Grandmother] made it clear she did not want to "put up with his crying for the next hour."  This had become a pattern, along with her open hostility towards me.  [C]hildren have become increasingly apprehensive whenever she picks them up.

*Id.*  On the same day, the court granted a temporary PFA order.

On December 13, 2023, the court held a final hearing on the petition. The court heard testimony from Mother, Paternal Grandmother, and Father. The court also viewed a doorbell video depicting the October 24, 2023 verbal exchange between Paternal Grandmother and Father that occurred outside of

_____

[1] Mother also filed a PFA petition against Father, which the trial court denied. Mother appealed that disposition at Docket No. 175 EDA 2024.

- 2 -

the parties' former marital home, where Father still resided at the time. In addition, the court viewed a doorbell video depicting a November 27, 2023 custody exchange between Mother and Paternal Grandmother at Mother's home and two additional videos from that day that did not have audio.

The October 24, 2023 doorbell video depicts the following verbal exchange between Paternal Grandmother and Father:

| | |
|---|---|
| **Father**: | (Indiscernible) |
| **PGM**: | (Indiscernible) put a hit on her. |
| **Father**: | (Indiscernible) and he said basically – he was like (indiscernible) you're (indiscernible) he was like (indiscernible) I told (indiscernible) and my friends and (indiscernible) and so you know (indiscernible). |
| **PGM**: | Well, she definitely (indiscernible) she would bet full. She was hoping that, you know – |
| **Father**: | (Indiscernible). |
| **PGM**: | Yeah. Yeah. Yeah. She fails to realize you're my kid (indiscernible) and you're stronger than that. And she doesn't (indiscernible) you know, we're going to be stealth about it. (Indiscernible) in her fact or anything. (Indiscernible) very stealth. So like I said (indiscernible) I'm hoping Spry talks to her and (indiscernible) and her see the light a little bit and (indiscernible). |
| **Father**: | I think she (indiscernible) the pictures and took according to (indiscernible) – |
| **PGM**: | Mm-hmm. |
| **Father**: | (Indiscernible) |
| **PGM**: | I think that's why there – mm-hmm. I think that's why there was a meeting on Saturday. |
| **Father**: | (Indiscernible) I just (indiscernible). |

N.T. PFA Hearing, 12/13/23, at 19-20.

The November 27, 2023 doorbell video depicts a custody exchange between Mother and Paternal Grandmother at Mother's front door:

| | |
|---|---|
| **PGM**: | Hi. How you feeling? That's good. I think rather than the long goodbye, it would be much better – give him to me. Come on buddy, Give Mom – tell Mommy you love her and you'll see her soon. You're going to talk to her tonight, buddy. Come one. Come with Nana. Remember it's Daddy's turn. Mommy gets a turn; Daddy gets a turn because they love you so much. Okay. Buddy, can you get in the car, okay? Where's the other bag? |
| **Mother**: | Right here. |
| **PGM**: | Okay. (Indiscernible) okay, buddy. Come on. Let's get – come on. Hand him over to me, please. Come on. I know. But we have to go. It just gets worse. |
| **Unidentified Speaker**: | (Indiscernible). |
| **PGM**: | (Indiscernible) long goodbyes – |
| **Unidentified Speaker**: | (Indiscernible). |
| **Mother**: | No. No. No. Get back in the car. Get back in the car. |
| **Unidentified Speaker**: | (Indiscernible). |

*Id.* at 27-28.

Relevant to this appeal, Mother testified that the former marital home has a "Google Nest" doorbell that records video outside of the front door, and that her phone was still connected to the "Google Nest" to receive videos. *Id.* at 14. Mother stated that the October 24, 2023 video was footage from the

front door of the parties' former marital residence and that she was not present during the verbal exchange between Paternal Grandmother and Father. Mother further testified that she had seen the video in question prior to December 6, 2023, but "never really paid much attention to it" and did not listen closely. *Id.* at 15. Mother stated that when she viewed the video on her phone on December 6, 2023, she thought "the comments made just seemed so out of proportion to what was going on" and "unbalanced" and "scary." *Id.* at 21. Mother testified that she felt "confused" and feared for her life when she viewed the video. *Id.*

In connection with the November 27, 2023 video, Mother testified that Children did not want to go with Paternal Grandmother for the custody exchange that day. Mother testified that Paternal Grandmother rang the doorbell several times and that Child 2 "was crying and hanging onto me, and he actually ran away and hid." *Id.* at 22-23. Mother testified that Paternal Grandmother "made a comment about [w]ell now I have to put up with him crying for an hour," was being "hostile," and yelled at Children during the exchange. *Id.* Mother further testified that she is concerned about what is happening when she is not there and that she fears for Children's safety. *Id.* at 29-30.

Paternal Grandmother confirmed that she had a conversation with Father about custody matters on the front porch on October 24, 2023, while Children were approximately ten feet away. Paternal Grandmother testified that her comment about "a hit" was "so off-the-cuff" and that she has no

intention of causing harm to Mother. *Id.* at 42-43. Paternal Grandmother explained that she was just having a "venting session" about Mother's attempts to keep Children away from Father and herself. *Id.* at 43. Paternal Grandmother testified that she thinks it's "[e]xtremely important that Children have Mother in their life" and that Mother "knows that." *Id.*

Paternal Grandmother testified that Child 1 is usually "smiling and ready to go" for custody exchanges but Child 2 "is a Mama's boy [and] always has a little bit harder time with the transition." *Id.* at 38. Paternal Grandmother testified that on November 27, 2023, once Child 2 got into her car he only cried for a block and then started to calm down. *Id.* She explained that Child 2's reaction is "progressively getting worse" during custody exchanges from Mother's house but that she has no problem picking Child 2 up from preschool and "he's smiley, bouncy." *Id.* at 38-39. Paternal Grandmother testified that after the November 27, 2023 custody exchange she dropped Children off at school and picked them up from school several times over the next week and took Children to a water park over the weekend, with no issues. *Id.* at 39-40.

Father testified that the October 24, 2023 conversation with Paternal Grandmother occurred after a child support hearing where he was unhappy and frustrated with the proceedings. He confirmed that, during the conversation, Children were on their electronic tablets about ten feet away. He denied making any threats towards Mother. He testified that he was never in agreement with Paternal Grandmother's comment about "taking a hit" on

Mother and explained that Paternal Grandmother's comment was "in a venting pattern, so I didn't feel it needed to be addressed because I knew that it was not a serious threat." *Id.* at 55. Father explained that there was no malice behind the comment. Father further explained that Paternal Grandmother was not talking about being "stealth" in reference to taking a hit on Mother; rather, they "were just going to be stealth about how we handled anything involving her." *Id.* at 55. Father confirmed that he is always very careful when he speaks in front of Children and does not talk badly about Mother in front of Children.

At the conclusion of the hearing, the trial court denied the PFA petition on the basis that Mother failed to present sufficient evidence to sustain her claims.

Mother timely appealed. Both Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises a sole issue for our review: "Did the court abuse its discretion by denying a [PFA] order when there was a credible threat of physical violence?" Mother's Br. at 7.

**A.**

In a PFA action, this Court reviews the trial court's legal conclusions for an error of law or an abuse of discretion. *Custer v. Cochran*, 933 A.2d 1050, 1053-54 (Pa. Super. 2007) (*en banc*). A trial court does not abuse its discretion for a mere error of judgment; rather, we will find an abuse of discretion "where the judgment is manifestly unreasonable or where the law

is not applied or where the record shows that the action is a result of partiality, prejudice, bias[,] or ill will." ***Mescanti v. Mescanti***, 956 A.2d 1017, 1019 (Pa. Super. 2008) (citation omitted). Moreover, on appeal, this Court will defer "to the credibility determinations of the trial court as to witnesses who appeared before it." ***Karch v. Karch***, 885 A.2d 535, 537 (Pa. Super. 2005) (citation omitted). It is well-settled that "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." ***Commonwealth v. Walsh***, 36 A.3d 613, 619 (Pa. Super. 2012) (citation omitted). Finally, we review the evidence of record in the light most favorable to, and grant all reasonable inferences to, the party that prevailed before the PFA court. ***Snyder v. Snyder***, 629 A.2d 977, 982 (Pa. Super. 1993).

The purpose of the PFA Act is "to protect victims of domestic violence from those who perpetrate such abuse" and "its primary goal is advance prevention of physical and sexual abuse." ***Lawrence v. Bordner***, 907 A.2d 1109, 1112 (Pa. Super. 2006) (citation and internal quotation marks omitted). "[T]he [PFA] Act does not seek to determine criminal culpability. A petitioner is not required to establish [that] abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence." ***Snyder***, 629 A.2d at 982. A "preponderance of evidence standard is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." ***Raker v. Raker***, 847 A.2d 720, 724 (Pa.

Super. 2004). The PFA Act defines the term "abuse," in relevant part, as follows:

> **"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:
>
> * * *
>
> (2) Placing another in reasonable fear of imminent serious bodily injury.

23 Pa.C.S. § 6102(a)(2).

In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of bodily injury. **See Raker**, 847 A.2d at 724-25. Since the PFA act's goal is to prevent abuse, a victim does not have to wait for abuse to occur for the act to apply. **Buchhalter v. Buchhalter**, 959 A.2d 1260, 1262-63 (Pa. Super. 2008). Past conduct is relevant to this consideration. **Id.** at 1263.

**B.**

In her sole issue, Mother avers that the trial court abused its discretion when it denied her PFA petition. Mother's Br. at 7. Mother argues that the trial court did not have to make credibility determinations because there were several videos before the court showing that Paternal Grandmother made a physical threat to Mother and that Children did not want leave Mother's home with Paternal Grandmother. **Id.** at 14. Mother argues that the conversation between Paternal Grandmother and Father, "where they stated and confirmed that someone should put a hit on [Mother] and be stealth about it" constituted "a reasonable threat causing concern for immediate serious injury." **Id.** at

15. Finally, Mother claims that when you view the evidence in a light most favorable to her and grant her the benefit of all reasonable inferences, that she clearly demonstrates by a preponderance of the evidence that she was in reasonable fear of imminent bodily harm. *Id.* Therefore, Mother argues, the trial court abused its discretion when it denied Mother's PFA petition. We disagree.

First, Mother misstates the appropriate standard of review. As stated above, we are compelled to review the evidence of record in the light most favorable to, and grant all reasonable inferences to, Paternal Grandmother as she is the party that prevailed before the PFA court. *See Snyder*, 629 A.2d 982. Moreover, Mother incorrectly asserts that the trial court did not have to made credibility determinations. Indeed, it is the solely the trial court's role to make credibility determinations, which this Court defers to, and weigh the evidence. *See Karch*, 885 A.2d at 537; *Walsh*, 36 A.3d at 619.

Here, the trial court did not find credible Mother's testimony that she was concerned about what happens when she is not there and fears for Children's safety around Paternal Grandmother. Trial Ct. Op., 12/12/24, at 4 (unpaginated). The trial court placed great weight on Mother's demeanor during the November 27, 2023 custody exchange and observed that Paternal Grandmother did not appear hostile, Mother allowed the Children to leave with Paternal Grandmother, and Mother did not take any action to protect Children from Paternal Grandmother from any perceived threat or risk of harm. The trial court opined:

- 10 -

At no time, did [Mother] try to shield [C]hildren from going with [Paternal Grandmother] or show any signs that [Mother] felt that [C]hildren were in any danger of bodily injury or physical abuse. . . .Additionally, there was no indication that the exchange rose to the level of [Paternal Grandmother] placing by physical menace [Mother] in fear of imminent serious bodily injury. At no time did the video or the audio indicate any open hostility on the part of [Paternal Grandmother] toward [Mother] as [Mother] averred in the [p]etition. The matter was simply a routine custodial exchange where one child was reluctant to go and [Mother] assisted [Paternal Grandmother] in the transfer of custody. If [Mother] felt that either she or [C]hildren were at risk of imminent serious bodily injury, were the victims of an attempt to cause bodily injury, or had been physically abused, the court would expect to see [Mother] asserting more protective conduct in opposition to [Paternal Grandmother] at the time of the custodial exchange. This was not the case.

Trial Ct. Op., 12/12/24, at 3 (unpaginated). The trial court also placed weight on Mother's actions, emphasizing that Mother waited over a week after the November 27, 2023 custody exchange to file a PFA petition while Children were in Paternal Grandmother's care numerous times during that week. *Id.* at 3-4.

Likewise, the trial court did not find Mother's testimony credible that she feared for her life after viewing the October 24, 2023 video. The trial court emphasized that Mother was not present for the verbal exchange between Paternal Grandmother and Father, that she viewed the video prior to December 6, 2023, and in fact had possession of the video for several months prior to filing a PFA petition. Trial Ct. Op. at 4-5 (unpaginated). Accordingly, the trial court found that the record "belies an assertion of abuse[.]" *Id.* at 4. The court characterized Paternal Grandmother's statements regarding

"taking out a hit" as "venting" that occurred outside of Mother's presence, rather than a threat to cause imminent serious bodily injury to Mother. *Id.* Moreover, the trial court credited Father's testimony when he stated that the phrase "we're going to be stealth about it" referred to the custody proceedings, and opined: "[t]he court does not view a statement about cautious actions in litigation to be such that would demonstrate meeting the burden of proof by a preponderance of the evidence of [] placing [] another in fear of imminent serious bodily injury." *Id.* at 4. Accordingly, the trial court concluded that Mother failed to demonstrate by a preponderance of the evidence that Paternal Grandmother placed her in reasonable fear of imminent serious bodily injury.

Our review of the record supports the trial court's findings. We decline to usurp the trial court's credibility determinations or reweigh the evidence. Viewing the evidence in the light most favorable to Paternal Grandmother and granting all reasonable inferences in favor of Paternal Grandmother, we conclude that the trial court did not abuse its discretion when it denied Mother's PFA petition against Paternal Grandmother.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/17/2024