**Karen RAKER, Appellee,**

v.

**Richard RAKER, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 18, 2003.

Filed April 7, 2004.

Spero T. Lappas, Harrisburg, for appellant.

Nicole M. Walters, Harrisburg, for appellee.

Before: TODD, BENDER and BECK, JJ.

OPINION BY BENDER, J.:

¶ 1 Richard Raker (Appellant) appeals from a final protection from abuse (PFA) order entered against him, prohibiting him from having any contact with Karen Raker (Appellee). Appellant also appeals from an order assessing costs for the PFA action.[1] Appellant contends that the evidence presented did not support a finding that Appellee was placed in reasonable fear of imminent serious bodily injury when Appellant entered her home in the early morning hours of November 17, 2002. Appellant also argues that the court erred in assessing costs against him. We affirm.

¶ 2 The trial court set forth the following recitation of the facts:

At the February 28, 2003 hearing both Mr. and Mrs. Raker testified as to an incident which took place on November 16, 2002. The parties have been married for nine years and are in the process of getting a divorce. They owned a marital residence at 293–295 Pine Street, Millersburg, Dauphin County. While married, the parties lived in the 293 Pine Street side of the duplex and rented the 295 Pine Street side. Upon their separation, Mrs. Raker took her daughter and moved to an apartment, but when the tenant in 295 Pine Street moved out, Mrs. Raker, through her attorney, informed Mr. Raker of her intention to move into the 295 Pine Street portion of the duplex. She explained that financial difficulties in maintaining her own apartment led her to the decision to move back into the one side of the marital property. A door in the basement connects the two sides of the duplex. Stairs from the basement of the

---

1. This Court granted Appellant's application for consolidation by order dated June 30, 2003.

295 Pine Street side lead to a door into the kitchen area. Mrs. Raker testified that in order to keep Mr. Raker out of her side of the duplex, she had her son-in-law install three eyehooks on her side of the basement door and another one on the door leading from the basement stairs into the kitchen. On November 16, 2002, Mrs. Raker moved into the 295 Pine Street side of the duplex.

Mrs. Raker testified that she laid down on the sofa around 10:30 p.m. and, around midnight, began hearing noises in the basement which she attributed to the furnace. Then, at about 2:00 a.m. she began to hear noises that sounded as if they were coming from the basement, as if a door were scraping along cement. Mrs. Raker called her son-in-law and asked him to come and check on things for her. When her son-in-law appeared in just minutes, he and Mr. Raker met at the kitchen door as Mr. Raker entered Mrs. Raker's kitchen and a scuffle ensued. According to Mrs. Raker's account of the events, Mr. Raker was wearing green socks on his hands; upon entering the kitchen, Mr. Raker began to choke her son-in-law and Mrs. Raker saw a knife fall to the floor. Mrs. Raker was scared and called the police. The men ended their scuffle with Mr. Raker picking up his knife and returning to his own side of the duplex. When the police arrived, they escorted Mrs. Raker to the 293 Pine Street side of the duplex. Mrs. Raker testified to a series of photographs that were taken in Mr. Raker's side of the duplex on November 16, 200[2]. Mrs. Raker described dirty laundry hanging on nails in the walls, a decapitated and delimbed doll similarly nailed to the wall, darts laying on the floor, a bag of cookies nailed to the wall, dilapidated furniture and other unkempt conditions in Mr. Raker's side of the duplex. Finally,

Mrs. Raker testified that the eyehooks she had her son-in-law install in the basement door were gone after the incident.

During her testimony, Mrs. Raker described other incidents that had taken place between her and Mr. Raker during which she was threatened or intimidated. In July 2002, Mrs. Raker was mowing the lawn for the tenant at the 295 Pine Street side of the duplex when Mr. Raker began videotaping her mowing the lawn and then ordered her to leave. When she continued to mow the lawn, Mr. Raker proceeded to begin throwing rocks in front of the mower and then threw the mower into the street. A neighbor who observed the incident called the police. Mrs. Raker also testified that while discussing their separation, Mr. Raker pounded a fist into his open hand and threatened that "if he put [Mrs. Raker] down [she] won't get back up" and he had also thrown a wooden chair at her during the time they were married.

Mrs. Raker denied ever hearing Mr. Raker knock on the kitchen door on the night of November 16, 2002 because she was sleeping but she agreed that Mr. Raker was, at that time, a joint owner of and entitled to be in the 295 Pine Street side of the duplex, and there were no existing court orders preventing him from entering the premises. She further admitted that despite the police searching both sides of the duplex, they were unable to find the knife that she had seen. Only after he son-in-law [sic] searched Mr. Raker's side of the basement did he find a butter knife in a drawer. Mrs. Raker further agreed that even the police advised her against moving into the 295 Pine Street side of the duplex, in light of the volatile history between her and her husband, but be-

cause of financial problems, she did not see any other solution.

Mr. Raker testified that on November 16, 2002, he had seen his tenant and her father getting her things moved out of the 295 Pine Street side of the duplex but did not see Mrs. Raker moving into that side of the duplex. He further stated that he did not know of Mrs. Raker's intention to move into 295 Pine Street at any time, either on November 16, 2002 or any other time in the future. Instead of staying at 293 Pine Street that evening, Mr. Raker went to his girlfriend's home and stayed there until about 10:00 p.m. when he returned to 293 Pine Street and went to sleep. He did not notice any activity on the other side of the duplex and saw garbage in the front yard but no cars in the driveway. He saw that the kitchen light was on but testified that that light was always on so he did not believe anyone was present in the residence. Mr. Raker noted that he had not had the opportunity to inspect the property when the tenant moved and that it was his intention to inspect the property when he entered through the basement on the night of November 16, 2002. Mr. Raker testified that the only eyehook on the basement door was on his side of the door to prevent the door from being opened and that he had installed a doorframe on that same door so that it only opened in one direction instead of swinging freely in either direction. According to Mr. Raker, when he unlatched the eyehook on his side of the door, it opened immediately and he did not take any eyehooks off of Mrs. Raker's side of the door. Mr. Raker testified that when he opened the door that led into the kitchen on the 295 Pine Street side of the duplex, Mrs. Raker's son-in-law grabbed him and told him he had no right to be in there. He explained that

the reason he had to come through the basement was because he did not have a key to 295 Pine Street and no one answered the door when he had knocked twice before. Mr. Raker denied having a knife with him when he entered 295 Pine Street, but admitted that he had a sixteen-penny spike or nail that he believed he had put in his pocket. Mr. Raker further denied wearing socks on his hands the evening of November 16, 2002.

In regard to the July 2002 incident with the mower, Mr. Raker admitted that Mrs. Raker had been mowing the lawn at 295 Pine Street and they began to argue and he did toss ballast stone in front of the mower as Mrs. Raker mowed the lawn. Mr. Raker testified that he stood in front of the mower to make Mrs. Raker leave but she continued to push the mower into his feet and eventually, he took the mower and pushed it into the street. Mr. Raker denied, however, ever threatening "to put down" Mrs. Raker while punching his open hand with a fist.

When asked why he was inspecting the 295 Pine Street property at 2:00 a.m., Mr. Raker testified that he knew Mrs. Raker would go there during the day time and that she would make false accusations against him for damage to the home. His intention was to inspect the property ahead of time to rebut her accusations, but he testified that he was not actually aware as to when Mrs. Raker intended to move into the 295 Pine Street property.

Trial Court Opinion (T.C.O.), 5/13/03, at 2–6 (citations to the record omitted).

¶ 3 Based upon the above facts and recognizing that a PFA order may be entered where the victim reasonably fears serious bodily injury, the trial court entered the final protection from abuse or-

der, requiring Appellant to vacate the property at 293–295 Pine Street and to turn over all firearms and permits to the Sheriff's Office. The order also prohibited Appellant from having any contact with Appellee. By separate order the court imposed the costs of the action on Appellant.

¶ 4 Specifically, the court explained that it believed that anyone would be in reasonable fear of serious bodily injury "upon finding an unexpected guest in the home" at 2:00 a.m. in the morning. T.C.O. at 7. The court further reasoned that "there is clearly a volatile history between the parties and this [c]ourt was convinced that there were significant threats in the past, which, when considered in conjunction with the November 16, 2002 events, would justify [Appellee] fearing injury at the hands of [Appellant]." *Id.* Although recognizing that the parties gave conflicting testimony regarding whether Appellant had a knife, the court accepted Appellee's testimony in conjunction with Appellant's acknowledgement that he was carrying a sixteen-penny spike,[2] and concluded that in the minimal light it was reasonable for Appellee to have mistaken the spike for a knife.

¶ 5 After Appellant's motion for reconsideration was denied, he filed the instant appeal to this Court, raising the following issues:

In a case which involves no bodily injury to Plaintiff, no serious bodily injury, no rape, no involuntary deviate sexual intercourse, no sexual assault, no statutory sexual assault, no aggravated indecent assault, no indecent assault, no incest, no use of a deadly weapon, no false imprisonment, no sexual abuse of children, and no *unreasonable* fear of *imminent serious* bodily injury, may the trial court enter a Protection from

Abuse Order based on the grounds that the Plaintiff experienced a subjective fear of some unspecified risk?

In such a case may the court assess costs against the Defendant?

Appellant's brief at 6.

■■■ ¶ 6 Appellant's arguments are essentially claims that the evidence was insufficient to establish that the alleged incidents rise to the level of abuse as defined in the Protection From Abuse Act (PFA Act), 23 Pa.C.S. §§ 6101–6117. In reviewing such a claim, we are guided by the following:

"When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inference, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence." ... This court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

*Fonner v. Fonner,* 731 A.2d 160, 161 (Pa.Super.1999) (quoting *Miller on Behalf of Walker v. Walker,* 445 Pa.Super. 537, 665 A.2d 1252, 1255 (1995)). We also note that the preponderance of evidence standard is defined as the greater weight of the evidence, *i.e.,* to tip a scale slightly is the criteria or requirement for preponderance of the evidence. *Commonwealth v. Brown,* 567 Pa. 272, 786 A.2d 961, 968 (2001), *cert. denied,* 537 U.S. 1187, 123 S.Ct. 1351, 154 L.Ed.2d 1018 (2003).

¶ 7 The Act provides the following definition of abuse:

"**Abuse.**" The occurrence of one or more of the following acts between fami-

---

**2.** The trial court noted that Appellant did not make clear why he was in possession of the spike.

ly or household members, sexual or intimate partners or persons who share biological parenthood.

(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

(2) Placing another in reasonable fear of imminent serious bodily injury.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecution commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102(a).

■ ¶ 8 Appellant first argues that the evidence does not support a finding that

Appellee was placed in reasonable fear of imminent serious bodily injury as required in 23 Pa.C.S. § 6102(a)(2). He relies on the definitions of "bodily injury" and "serious bodily injury" set forth in 18 Pa.C.S. § 2301,[3] attempting to compare the differences between bodily injury and serious bodily injury with simple assault and aggravated assault. To support this contention, Appellant cites *Commonwealth v. Bryant,* 282 Pa.Super. 600, 423 A.2d 407 (1980),[4] and *Commonwealth v. Roche,* 783 A.2d 766 (Pa.Super.2001),[5] to show that the actions taken by the defendants in each case did not constitute attempts to inflict serious bodily injury.

■ ¶ 9 Appellant's reliance on these two criminal cases is misplaced. Both opinions focus on the intent of the perpetrator, not on the victim's response to the perpetrator's actions. In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury, which is exactly the conclusion arrived at by the trial court here. Appellant's intent is of no moment.

■ ¶ 10 Appellant further appears to argue that Appellee's testimony about incidents that occurred previously were not alleged by Appellee in her petition and were too remote in time to be considered by the court. This argument is belied by case law. Specifically, in *Miller,* the court explained that:

---

**3.** Appellant correctly points out that "[t]erms not defined in [the PFA Act] shall have the meaning given to them in 18 Pa.C.S. (relating to crimes and offenses)." *See* 23 Pa.C.S. § 6102(b).

**4.** This Court found that the defendant's actions in *Bryant,* throwing one victim to the ground and kicking another victim in the course of a robbery, did not evidence an attempt to inflict serious bodily injury.

**5.** In *Roche,* this Court held that evidence of the defendant's punching the victim while using belligerent language was insufficient to sustain a conviction for aggravated assault because that evidence did not establish that the defendant intentionally caused or attempted to cause serious bodily injury.

Questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and may be reversed on appeal only when a clear abuse of discretion was present. *Soda v. Baird,* 411 Pa.Super. 80, 600 A.2d 1274 (1991). In *Snyder v. Snyder, supra,* the court held that a person filing a protection from abuse petition will not be "rigorously limited to the specific allegation of abuse found in the Petition." 427 Pa.Super. at 502, 629 A.2d at 981. The court further held that in light of the purpose of the Act to "prevent imminent harm to abused person(s)," some flexibility must be allowed in the admission of evidence relating to past acts of abuse. *Id.* at 503–04, 629 A.2d at 982. *Miller,* 665 A.2d at 1259. Moreover, the *Miller* court held that it was not an abuse of discretion for the court to consider evidence of abuse that occurred six years earlier. The court reasoned that:

> In light of the protective purposes of the act, it was within the trial court's discretion to hear any relevant evidence that would assist it in its obligation to assess the appellee's entitlement to and need for a protection from abuse order. If the trial court found the testimony to involve events too distant in time to possess great relevance to the case, it could certainly have assigned less weight to the testimony. However, it was not an abuse of discretion for the trial court to hear the evidence. Past abusive conduct on the appellant's part was a crucial inquiry necessary for entry of a proper order.

*Id.* See also *Commonwealth v. Snell,* 737 A.2d 1232 (Pa.Super.1999) (stating that evidence, showing that twice within several months perpetrator's wife and child were placed at continued risk of harm, supported the extension of the PFA order).

¶ 11 Finally, we note that throughout Appellant's brief he relates the facts in a manner that denigrates the seriousness of his actions. He fails to recognize that Appellee's testimony regarding her fear of Appellant was believed by the trial court and in conjunction with her testimony about Appellant's actions previously and on the night of the precipitating events is sufficient to support the court's determination that she was in fear of imminent serious bodily injury. See *Williamson v. Williamson,* 402 Pa.Super. 276, 586 A.2d 967, 972 (1991) (providing that "finder of fact is entitled to weigh evidence and assess credibility" and "believe all, part or none of the evidence presented"). Thus, because the evidence believed by the trial court is sufficient to establish that due to Appellant's actions Appellee was in reasonable fear of bodily harm, we affirm the trial court's order.[6]

¶ 12 Order affirmed.

---

**6.** With regard to Appellant's contention that the trial court erred in assessing costs against him, we find that Appellant has failed to address this argument anywhere in his brief. See Pa.R.A.P. 2119(a). Accordingly, this issue is waived. See *Commonwealth v. Jones,* 572 Pa. 343, 815 A.2d 598, 604, n. 3 (2002). Despite concluding that Appellant has waived this issue, we note that 23 Pa.C.S. § 6106 provides for the assessment of fees and costs if the petitioner prevails in the action.