J-A04008-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| D.J.S. | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | | |
| v. | | |
| J.D.S. | | |
| Appellant | | No. 1445 MDA 2017 |

Appeal from the Order Entered August 16, 2017
In the Court of Common Pleas of York County
Civil Division at No: 2015-FC-000259-12A

BEFORE:  STABILE, NICHOLS, AND RANSOM,* JJ.

MEMORANDUM BY STABILE, J.:                      **FILED MAY 22, 2018**

Appellant, J.D.S. ("Father"), appeals from the Court of Common Pleas

of York County's order granting a final protection from abuse ("PFA") order in

favor of Appellee, his daughter, D.J.S.  We affirm.

The trial court summarized the procedural history as follows:

> On July 21, 2017, [Mother] filed petitions seeking temporary PFA orders on behalf of her minor daughters, [D.J.S.] and S.S. Following an *ex parte* proceeding, Honorable Todd J. Platts entered temporary PFA orders against [Father] which directed, in part, that [Father] [] was to have no contact with either child.  A hearing whether permanent PFA orders should be entered was scheduled for August 16, 2017.
>
> Following that hearing, [the trial court] granted the petition for a PFA order against [Father] related to [D.J.S.] but denied the requested PFA order related to S.S.  As to the order protecting

_____

* Retired Senior Judge assigned to the Superior Court.

[D.J.S.], the trial court directed that [Father] was to have no contact with her, direct or indirect, through third parties, or through social media for a period of 18 months. The order further directed [Father] to obtain a psychological evaluation, follow through with resulting recommendations, and pay court costs.

On August 25, 2017, [Father] filed a Motion for Reconsideration[,] which the trial court denied in an order filed September 13, 2017.

On September 15, 2017, [Father] filed a Notice of Appeal and a [Pa.R.A.P.] 1925(a) statement.

Trial Court Opinion, 10/4/17, at 1-2 (citations to record and footnotes omitted).

The trial court summarized the relevant factual background as follows:

During the hearing held August 16, 2017, Molly McCaughey testified that she is a nurse practitioner employed by WellSpan Pediatrics and that 13-year old [D.J.S.] is a patient in the practice. McCaughey initially treated [D.J.S.] for depression. On July 5, 2017, [D.J.S.] presented with "worsening depression and thoughts of self-harm" and "suicidal ideation." McCaughey also noted that [D.J.S.] displayed superficial lacerations caused by cutting.

[D.J.S.] was immediately referred to crisis intervention and was admitted to Roxbury Treatment Center that same day. She remained in the mental health facility between July 5 and July 20, 2017. There, she was treated for depression, anxiety, and anorexia. Following her release from Roxbury, [D.J.S.] was referred to an eating disorder clinic at Hershey Medical Center.

Mother testified that she is the mother of [D.J.S.] and S.S. and the wife of [Father]. Mother sought an emergency PFA order contemporaneously with [D.J.S.] being hospitalized at Roxbury. Mother had learned that following a conversation with her father, [D.J.S.] wanted to kill herself. Further, "[e]ach and every time her father contacted her[, D.J.S] would try to cut herself or scratch herself and she would go to one of the mental health specialists and get help." As a result, Roxbury disallowed contact between [D.J.S.] and [Father].

Leading up to [D.J.S.]'s admission to the psychiatric facility, Mother noticed cuts on [D.J.S.]'s wrists the Sunday [D.J.S.] returned from vacation with her father.

Mother filed the petition for a PFA order "[b]ecause [D.J.S.] is suicidal, she self-harms and she's starving herself to death." Mother testified that [D.J.S.]'s weight has dropped to 84 pounds "in the span of just a couple of months." At the time of the hearing, [D.J.S.] had a "team of about 5 medical professionals that deal with her every day."

Based on the many years that she lived with [Father], [Mother] attributes the causes of [D.J.S.]'s problems to be "her relationship with her father."

Asked why she refuses to eat, [D.J.S.] testified that her father and others, "have told me that I needed to lose weight so I decided I would act on that and stop eating." According to [D.J.S.], her father also caused her depression because he "tells me that I'm lying all the time and there is nothing wrong with me." She further described that when she was prescribed medication for [gastric esophageal reflux ("GERD")] and depression, [Father] "said that . . . I didn't acutally have GERD or depression, and I was just making it up because it didn't seem like I had any of those things and he tried to stop me from taking my medication."

[D.J.S.] displayed to the trial court marks on her arm and hands and described marks on her upper right leg and stated the scar resulted from her cutting herself with her "fingers, paper, scissors, eraser and pencil sharpeners." [D.J.S.] testified she cut herself during her vacation with [Father] because "my dad was telling me that whole day Saturday that he doesn't want me to take my medication because I was lying about all of it and he doesn't think that I was depressed[.]" Further, [Father] said she did not need to be admitted to the mental health facility because "I was faking the whole thing" and that it was too expensive for her to stay at the facility.

While she was a patient at Roxbury, [D.J.S.] asked [Father] whether he was engaged. According to [D.J.S.], [Father] responded that he had been engaged for some time but "he wasn't going to tell . . . me because he wanted to keep me in the dark about all of this stuff that was going on because I wasn't trustworthy enough for that information." [Father] also told

[D.J.S.] that "he was happier with [his fiancée] and her daughter . . . than he ever was with us."

When [Father] told her those things, [D.J.S.] "wanted to hurt" herself.

*Id*. at 3-6 (citations to the record, and footnotes omitted).[1]

Appellant argues the evidence was insufficient to show that Father "abused" D.J.S., as the term is defined in the Protection From Abuse Act, 23 Pa.C.S.A. §§ 6101–6117.[2] We disagree.

We review the propriety of a PFA order for error of law or abuse of discretion. *See*, *e.g.*, *Ferko–Fox v. Fox*, 68 A.3d 917, 920 (Pa. Super. 2013). We have described this standard as "not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Depp v. Holland*, 636 A.2d 204, 205–06 (Pa. Super. 1994) (citation omitted).

"When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all

---

[1] Father also testified at the same hearing. Father essentially denied all of D.J.S.'s allegations. However, the trial court found D.J.S's testimony credible. Trial Court Opinion, 10/4/17, at 7.

[2] *See* 23 Pa.C.S.A. § 6102.

- 4 -

reasonable inference, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence." ***Fonner v. Fonner***, 731 A.2d 160, 161 (Pa. Super. 1999) (citation omitted).[3] The preponderance of evidence standard is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence. ***See Raker v. Raker***, 847 A.2d 720, 724 (Pa. Super. 2004) (citation omitted).

The thrust of the instant appeal is whether Father's conduct meets the definition of "abuse" as described in the PFA Act. Section 6102 of the Act defines "abuse" as follows:

> The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:
>
> (1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.
>
> (2) Placing another in reasonable fear of imminent serious bodily injury.
>
> (3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).
>
> (4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

---

[3] ***See also*** 23 Pa.C.S.A. § 6107(a) ("the plaintiff must prove the allegation of abuse by a preponderance of the evidence").

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102(a).

The trial court found Father's conduct caused D.J.S.'s serious mental injuries, which in and of themselves are sufficient to establish "abuse" under the PFA Act. Trial Court Opinion, 10/4/17, at 9-10. To this end, the trial court noted that the definition of abuse under the PFA Act covers physical and sexual abuse of minors, "including such terms as defined in Chapter 63 (relating to child protective services)." *Id.* (citing 23 Pa.C.S.A. § 6102(a)(4)).

Section 6303(b.1) of the Child Protective Services Act provides that the term "child abuse" means "intentionally, knowingly or recklessly . . . [c]ausing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act." 23 Pa.C.S.A. § 6303(b.1)(3). Moreover, under the Child Protective Services Act, serious mental injury means:

A psychological condition, as diagnosed by a physician or licensed psychologist, including the refusal of appropriate treatment, that:

(1) renders a child chronically and severely anxious, agitated, depressed, socially withdrawn, psychotic or in reasonable fear that the child's life or safety is threatened; or

(2) seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks.

23 Pa.C.S.A. § 6303(a).

The trial court summarized the testimony presented at the August 16, 2017 hearing as follows:

Here, the nurse practitioner employed by the pediatric medical practice that treated [D.J.S.] testified that [D.J.S.] suffered from depression, anxiety, and anorexia. She was admitted to a psychiatric hospital when her depression worsened, she engaged in self-mutilation, and she expressed the desire to kill herself.

[D.J.S.] testified that she felt and behaved in the manner described above because [Father] thought she was generally a liar and untrustworthy, had specifically lied about being depressed, criticized her appearance, told her he was happier with his fiancée and her daughter than he had ever been with her, tried to dissuade her from taking prescribed medication for her mental health conditions, and blamed her for causing him to pay a hospital bill he thought too expensive. [Father] also told [D.J.S.] she should smother her sister with a pillow to stop her snoring and that this method of killing her would leave no visible marks.

Trial Court Opinion, 10/4/17, at 10 (citations to record omitted).

In light of the evidence proffered at the hearing, the trial court concluded that:

[T]he credible testimony presented on behalf of [D.J.S.] established that the serious mental injury perpetrated by [Father] caused physical injury to [D.J.S.]. That is, [D.J.S.] self-mutilated, starved herself, contemplated suicide, and was increasingly anxious and depressed because Appellant criticized her appearance and told her (1) she was a liar; (2) she did not need medication; and (3) her in-patient psychiatric care was a financial burden for him.

*Id.* at 12.

We agree with the trial court's analysis and conclusions.[4]

Given the overarching purpose of the PFA Act "to protect victims of domestic violence from those who perpetrate the abuse," **Fonner**, 731 A.2d at 161, given the standard of proof that a petitioner in PFA action must establish (preponderance of the evidence, **id.**), our standard when reviewing challenges to the sufficiency of the evidence ("we review the evidence in the light most favorable to the petitioner and grant[] her the benefit of all reasonable inference," **id.**), and the record developed before the trial court, we conclude there is sufficient evidence in the record supporting the issuance

---

[4] Additionally, the trial court also found that Appellant's reckless conduct caused bodily injury to D.J.S., which is sufficient to establish "abuse" for purposes of the PFA Act. **See** Trial Court Opinion, 4/10/17 at 12.

It should be noted that "reckless" and "bodily injury" in the context of the PFA Act have the same meaning given to them in the Crimes Code. **See** 23 Pa.C.S.A. 6102(b).

Section 302 of the Crimes Code, in relevant part, defines "reckless" as follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation

18 Pa.C.S.A. § 302(b)(3).

of a PFA order against Father for the protection of D.J.S. Accordingly, we conclude the trial court did not err in entering a PFA order against Father.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/22/2018