J-S03032-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MMACHI ONYINYECHUKWU DIMORIAKU | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRANDON LLOYD BRAYE | : | |
| | : | No. 1219 MDA 2025 |
| Appellant | : | |

Appeal from the Order Entered August 14, 2025
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
202508879

BEFORE:  DUBOW, J., BECK, J., and LANE, J.

MEMORANDUM BY LANE, J.:                                    **FILED: APRIL 15, 2026**

Brandon Lloyd Braye ("Braye") appeals *pro se* from the final Protection From Abuse ("PFA") order entered to protect Mmachi Onyinyechukwu Dimoriaku ("the victim").  We affirm.

The factual and procedural history underlying the instant appeal is as follows.  The parties had been involved in an intimate relationship for approximately three years when, in June of 2025, the victim initiated involuntary mental health commitment proceedings for Braye based on her belief that he had a psychotic break.  *See* N.T., 8/14/25, at 4-5.  Braye was thereafter involuntarily committed to a psychiatric institution for approximately one week in July 2025.  *See id*. at 10.  After Braye was released from his commitment, there was an encounter between the parties during which he was verbally abusive to the victim, and tried to physically restrain

her to the point she had to "break away." ***Id***. at 5. As a result of Braye's actions, the parties separated. ***See id***. The victim thereafter blocked Braye on her phone and social media accounts, and she explicitly told him that she did not want any further contact with him. ***See id***. at 4-5.

On August 6, 2025, the victim returned to her home at 2:00 a.m. to find the flag up on her mailbox and a handwritten letter inside it from Braye. ***See id***. at 4. The victim had left her home the prior day around 4:00 p.m., and noted that there was nothing in her mailbox at that time. ***See id***. Although the victim described the content of the letter as "a lot of jumble," and she was not able to understand much of it, she nevertheless felt threatened by certain parts of the letter. ***See id***. The letter indicated, *inter alia*, "I am disappointed in your behavior, toward me," "I still remember where you reside," and "you have disrespected me, in person, FOR THE FINAL TIME. I WILL NO LONGER TOLERATE MISBEHAVOIR." Exhibit 1 (capitalization in original). Braye signed the letter using his full name. ***See id***. Braye also left a religious document in the victim's mailbox, which consisted of a Jehovah's Witness pamphlet that stated, "[w]ill suffering ever end," with the "yes" option highlighted. ***Id***.

Out of concern for her safety, the victim filed a PFA petition against Braye on August 7, 2025. The trial court conducted an *ex parte* hearing, issued a temporary PFA order against Braye, and scheduled a final PFA hearing. At the final PFA hearing conducted on August 14, 2025, the victim

testified to the above facts, as well as the fact that she felt threatened by Braye. *See* N.T., 8/14/25, at 4.

Braye attended the hearing and admitted that "[he] was having a breakdown." *See id*. at 10. Braye explained that the victim made a call from his phone, and he was thereafter involuntarily committed in a psychiatric institution for approximately one week in July of 2025. *See id*. Braye also admitted to being at the victim's property on August 6, 2025, after the parties had separated. *See id*. at 8, 14. Further, Braye admitted to authoring the letter to the victim and depositing it in her mailbox, along with the Jehovah's Witness pamphlet. *See id*. at 8, 14, 16, 17. Braye testified that, when he writes a letter, he capitalizes specific words for emphasis. *See id*. at 14. Braye then read the letter that he wrote to the victim aloud, in open court, and indicated the specific words within the letter that he capitalized for emphasis. *See id*. at 14-16.

At the conclusion of the hearing, the trial court indicated its finding that the victim's testimony was credible and that her fear of Braye was reasonable. *See id*. at 19-20. The trial court then issued a final PFA order on behalf of the victim and against Braye, effective August 14, 2025, through August 14, 2028. Pursuant to the order, Braye was prohibited from: (1) abusing, stalking, or harassing the victim; (2) having any direct or indirect contact with the victim; (3) being at the victim's residence; and (4) possessing or owning any

firearms. **See** Final PFA Order, 8/14/25, at 1-4. Braye filed a timely *pro se* notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Braye raises the following issues for our review:

1. Whether the trial court erred in finding sufficient evidence of "abuse" under 23 Pa.C.S.[A.] § 6102(a) in the absence of physical injury, credible threats, or corroborating evidence?

2. Whether the trial court committed reversible error by making a credibility determination that was unsupported by the record, where [the victim's] testimony was uncorroborated, internally inconsistent, and lacked objective support?

3. Whether the trial court erred in drawing adverse inferences from [Braye's] involuntary mental health commitment when the discharge records demonstrated no justification for the . . . commitment?

4. Whether the trial court's reliance on factually incorrect statements regarding [Braye's] commitment, contradicted by official records, constituted reversible error?

5. Whether the trial court improperly admitted unauthenticated evidence in the form of a religious pamphlet without proper foundation under Pa.R.E. 901(a) and without conducting a Pa.R.E. 403 balancing test?

6. Whether the trial court failed to properly consider [Braye's] alibi testimony that contradicted the alleged timeframe of events?

7. Whether the trial court erred in failing to address the uncontroverted issue of wrongful retention of [Braye's] personal property?

8. Whether the trial court violated [Braye's] due process rights by denying him the right to call witnesses and present a complete defense?

Braye's Brief at 2 (issues reordered for ease of disposition).

- 4 -

Our standard of review for PFA orders is well-settled. In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion. *See Boykai v. Young*, 83 A.3d 1043, 1046 (Pa. Super. 2014). With regard to its factual findings, the trial court, when sitting as the finder of fact in a PFA proceeding, is entitled to weigh evidence, assess credibility, and believe all, part, or none of the evidence presented. *See Raker v. Raker*, 847 A.2d 720, 726 (Pa. Super. 2004).

We begin with Braye's first issue, wherein he challenges the sufficiency of the evidence supporting the final PFA order. When a claim is presented on appeal that the evidence was not sufficient to support a PFA order:

> [W]e review the evidence in the light most favorable to the petitioner and[,] granting [the petitioner] the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

*K.B. v. Tinsley*, 208 A.3d 123, 128 (Pa. Super. 2019).

"The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *Buchhalter v. Buchhalter*, 959 A.2d 1260, 1262 (Pa. Super. 2008).

The PFA Act defines "abuse," in relevant part, as follows:

"Abuse." The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

* * * *

(2) Placing another in reasonable fear of imminent serious bodily injury.

* * * *

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102(a)(5).

This Court has stated that, "[i]n the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury . . .." **Raker**, 847 A.2d at 725. We note that both subsections (2) and (5) of section 6102 involve reasonable fear of bodily injury. However, they contemplate fear in different degrees. Whereas subsection (2) involves conduct that places a victim in "reasonable fear of imminent serious bodily injury," subsection (5) addresses courses of conduct which place the victim in "reasonable fear of bodily injury." 23 Pa.C.S.A. § 6102(a)(2), (5). Thus, in the context of a PFA case proceeding under subsection (2), the trial court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury. **See** 23 Pa.C.S.A. § 6102(a)(2); **see also Raker**, 847 A.2d at 725. However, in the context of a PFA case proceeding under subsection (5), the trial court's objective is to determine whether the individual has knowingly engaged in a course of

- 6 -

conduct or repeatedly committed acts which have placed the victim in reasonable fear of bodily injury. *See* 23 Pa.C.S.A. § 6102(a)(5).

Importantly, "[t]he PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence." *K.B.*, 208 A.3d at 128 (citation and brackets omitted). A "preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, [enough] to tip a scale slightly." *Raker*, 847 A.2d at 724.

Finally, we note that a PFA petitioner is not required to file a police report, nor is it necessary for the petitioner to introduce medical evidence of an injury. *See Custer v. Cochran*, 933 A.2d 1050, 1058 (Pa. Super. 2007). Similarly, the victim is not required to prove the intent of the alleged abuser. *See Raker*, 847 A.2d at 725 (holding that the intent of the alleged abuser is of no moment). Instead, the petitioner's testimony, without more, is sufficient to establish the requirements for a final PFA order if such testimony is believed by the trial court. *See Custer*, 933 A.2d 1058.

In the instant case, Braye contends that the evidence of abuse was legally insufficient under section 6102(a). Braye argues that the evidence showed only that he left a letter and religious pamphlet in the victim's mailbox. Braye contends that no physical contact occurred, no threats of bodily harm were made, and no fear of imminent serious bodily injury was established. Braye asserts that "the letter's content, while perhaps unwelcome, did not

- 7 -

constitute threats within the statutory definition." Braye's Brief at 9. Braye submits that the statements "I still recall where you live" and "you have dishonored my presence" do not rise to the level of threats of imminent serious bodily injury. *Id*. Braye maintains that these vague expressions of dissatisfaction fall short of the specific threat requirement established by the PFA statute. Braye claims that "[t]he trial court's expansion of the statutory definition to encompass non-threatening communications constitutes legal error warranting reversal." *Id*.

The trial court considered Braye's sufficiency challenge and concluded that it lacked merit. The court reasoned:

> The court was able to hear from, and directly observe, both [the victim] and [Braye] during the hearing. The court found [the victim's] testimony regarding her fear of [Braye] to be reasonable based upon the circumstances, specifically the unpredictability and volatility of [Braye] after June of 2025 when both parties admit that [the victim] moved for [Braye's] involuntary commitment to a psychiatric institution. [Braye] further admitted to authoring the letter, and depositing the letter, in [the victim's] mailbox that put [the victim] in reasonable fear of [Braye]. The court found the language used in [Braye's] letter, specifically stating that [the victim] has disrespected [Braye] for the final time and that [Braye] would no longer tolerate misbehavior, to be objectively threatening in nature. Additionally, the court found the messaging and [Braye's] intentional highlighting in the religious pamphlet to compound the threatening nature of [his] correspondence.
>
> Based upon a totality of the circumstances, the court found that [the victim] had established her burden of proof by a preponderance of the evidence that she was in reasonable fear of death or serious bodily injury from [Braye]. No proof of physical injuries, witnesses to abuse acts, specific dates of incidents, or police involvement are required under the law for [the victim] to establish her burden that she was in reasonable fear of [Braye].

Trial Court Opinion, 9/23/25, at 5-6 (unnecessary capitalization omitted).

Here, the trial court did not specify which subsection of section 6102(a) that it found was satisfied by a preponderance of the evidence to support the final PFA order. However, based on the trial court's finding that the victim was "in reasonable fear of death or serious bodily injury" from Braye, it appears that the trial court found that the victim satisfied subsection (2).

Viewing the evidence in the light most favorable to the victim, we conclude there was ample evidence from which the trial court could find, by a preponderance of the evidence, that Braye placed the victim in reasonable fear of imminent serious bodily injury. *See* 23 Pa.C.S.A. § 6102(a)(2). The record reflects that Braye and the victim had been in an intimate relationship. *See* N.T., 8/14/25, at 5. The record further reflects that, approximately one month prior to him leaving the letter and religious pamphlet in her mailbox, Braye had a psychotic breakdown and was involuntarily committed to a psychiatric institution for approximately one week as a result of proceedings initiated by the victim. *See id*. at 4, 10. After Braye was released from his commitment, he was verbally abusive to the victim and physically abusive to her by attempting to physically restrain her to the point she had to "break away." *See id*. at 4-5. The record further reflects that, after the victim had blocked Braye on her phone and social media accounts and explicitly told him that she wanted no further contact with him, he went to her home and left a letter and a pamphlet in her mailbox. *See id*. at 8, 14. Braye admitted to

authoring the letter to the victim wherein he made statements which the victim could reasonably interpret as constituting threats to her safety. *See id*. at 8, 14, 16, 17. Specifically, the letter stated, "I am disappointed in your behavior, toward me," "I still remember where you reside," and "you have disrespected me, in person, FOR THE FINAL TIME. I WILL NO LONGER TOLERATE MISBEHAVOIR." Exhibit 1 (capitalization in original). Braye informed the trial court that he uses capital letters to emphasize specific words. *See id*. at 14.

We conclude that, by indicating that the victim had disappointed and disrespected him while capitalizing "FOR THE FINAL TIME," Braye clearly wanted to emphasize to the victim that he had reached his limit, in some respect, as to her. While Braye did not specify how he would ensure such finality, the victim could reasonably have feared that "FOR THE FINAL TIME" meant that he would inflict death or serious bodily injury upon her in order to ensure such finality. Further, Braye's statement that "I still remember where you reside" could be interpreted as a threat that she would not be safe — from him — in her own residence. Braye also admitted that he left a Jehovah's Witness pamphlet in the victim's mailbox that stated, "will suffering ever end," with the "yes" option highlighted. *See* N.T., 8/14/25, at 17; *see also* Exhibit 1. This language from the pamphlet, when considered in connection with Braye's psychotic breakdown, his involuntary commitment, and the threatening language he used in the letter, could have been interpreted by

the victim as Braye indicating his intention to take some form of drastic or "FINAL" action against the victim to end his own suffering by causing death or serious bodily injury to her. Finally, the trial court credited the testimony of the victim and found that she was in reasonable fear of death or serious bodily injury from Braye. *See* N.T., 8/14/25, at 19-20. The victim's credible testimony regarding her fear of Braye, in conjunction with his psychotic breakdown and her testimony about Braye's actions previously and the threatening language in the letter and pamphlet, was sufficient to support the trial court's determination that Braye placed the victim in reasonable fear of imminent serious bodily injury. *See* 23 Pa.C.S.A. § 6102(a)(2); *see also Raker*, 847 A.2d at 726; *see also Custer*, 933 A.2d at 1058.

We additionally conclude that the record supports a finding that Braye engaged in a course of conduct towards the victim under circumstances which placed her in reasonable fear of bodily injury. *See* 23 Pa.C.S.A. § 6102(a)(5). As explained above, in the context of a PFA case proceeding under subsection (5), the trial court's objective is to determine whether the individual has knowingly engaged in a course of conduct or repeatedly committed acts which have placed the victim in reasonable fear of bodily injury. *See* 23 Pa.C.S.A. § 6102(a)(5). Here, we conclude that the record reflects that, by verbally abusing and physically restraining the victim, and then leaving the threatening letter and pamphlet in her mailbox one month after she had ended their relationship, broken off all communication with him, and explicitly told him

- 11 -

that she wanted to further interaction with him, supports a finding by a preponderance of the evidence that Braye knowingly engaged in a course of conduct that placed the victim in reasonable fear of bodily injury. **See id**.[1] Thus, Braye's first issue merits no relief.

In his second issue, Braye challenges the trial court's finding that victim's testimony was credible. As explained above, the trial court, when sitting as the finder of fact, is entitled to weigh evidence, assess credibility, and believe all, part, or none of the evidence presented. **See Raker**, 847 A.2d at 726. This Court must defer to the credibility determinations made by the trial court as to the witnesses who appeared before it. **See K.B.**, 208 A.3d at 128.

Braye argues that the victim's testimony "suffered from multiple deficiencies that render the trial court's credibility finding an abuse of discretion." Braye's Brief at 5. Braye contends that the victim's testimony was "entirely uncorroborated" because "[n]o witnesses testified to corroborate her claims, no physical evidence supported her allegations of fear, and no documentation verified her version of events." **Id**. Braye further argues that the victim's claims regarding his intent and state of mind were purely speculative. **See id**. Braye additionally asserts that the victim's testimony contained internal inconsistencies regarding the timing of events and the

_____

[1] It is well-settled that this Court may affirm on any basis appearing of record. **See Lucas v. Lucas**, 882 A.2d 523, 531 (Pa. Super. 2005).

nature of her alleged fear. Braye maintains that the victim's claim of discovering the letter and pamphlet in her mailbox at 2:00 a.m. after being absent since 4:00 p.m. the previous day raises questions about the accuracy of her recollection and the reliability of her timeline. Braye submits that the trial court's acceptance of the victim's testimony without critical analysis of these deficiencies constitutes a manifest abuse of discretion requiring reversal.

The trial court considered Braye's second issue and determined that it lacked merit. The court reasoned:

> At the August 14, 2025 proceeding, this court found [the victim's] testimony to be credible, specifically regarding her fear of [Braye]. [The victim] testified that on August 6, 2025, she returned to her home to find a letter from [Braye] in her mailbox. [The victim] testified that the letter was jumbled, and she was not able to understand some of it, but she felt threatened by the specific part of the letter that stated that [Braye] still remembered where she lived. A copy of the letter was admitted as an exhibit. [The victim] testified that she filed [an involuntary commitment] petition for [Braye] in June of 2025 because [he] "had a psychotic break." [The victim] further testified that after [Braye] was released from his commitment [he] was verbally abusive to her, and at one point tried to physically restrain her. [The victim] testified that as a result of [Braye's] actions, the parties separated and [the victim] blocked [him] on everything.
>
> [Braye] himself admitted to being at [the victim's] property on August 6, 2025 after [the victim] told him that she did not want contact with him. [Braye] admitted that he was in the [psychiatric unit] in July of 2025 due to [the victim initiating commitment proceeding] on him. [Braye] admitted to authoring the letter in question to [the victim] and depositing it in her mailbox. [Braye] further admitted to including a Jehovah's Witness pamphlet that states "will suffering ever end" and highlighting the "yes" option.

- 13 -

Trial Court Opinion, 9/23/25, at 4-5 (footnote, citations to the record, and unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion by the trial court in finding the testimony of the victim to be credible. As explained above, we must defer to the credibility determinations made by the trial court as to the witnesses who appeared before it. *See K.B.*, 208 A.3d at 128. This Court may not reweigh the evidence or make its own credibility determinations based on a cold record. *See id*. Thus, we are bound by the trial court's determination that the victim's testimony was credible.

Moreover, contrary to Braye's assertions otherwise, the victim's testimony was not "entirely uncorroborated." Braye's Brief at 5. Indeed, Braye corroborated much of the victim's testimony by admitting to, *inter alia*: being at the victim's property on August 6, 2025; authoring the letter in question and placing it in the victim's mailbox; and placing the Jehovah's Witness pamphlet in the victim's mailbox. *See* N.T., 8/14/25, at 8, 10, 14, 16, 17. Accordingly, as we may not disturb the trial court's credibility determination regarding the victim, Braye's second issue merits no relief.

In Braye's third and fourth issues, he challenges the trial court's consideration of his involuntary commitment. As the issues are nearly identical, we will address them together. In his third issue, Braye contends that the trial court improperly considered his involuntary commitment as evidence supporting the issuance of a final PFA order when the official

discharge records demonstrated no justification for the commitment. According to Braye, he was discharged from the psychiatric unit under voluntary status with no grounds justifying the commitment. Braye claims that the trial court's consideration of his involuntary commitment as evidence of his propensity for concerning behavior, and an inference that supported the victim's claims of fear, was prejudicial and without foundation.

In his fourth issue, Braye asserts that the trial court improperly accepted the victim's characterization of Braye's involuntary commitment as evidence of his mental instability and potential dangerousness. Braye claims that the official discharge records established that he was discharged under voluntary status with no grounds supporting the original commitment.

Preliminarily, we must determine whether Braye preserved these issues for our review. It is well-settled that issues not raised in the trial court are waived and cannot be raised for the first time on appeal. *See* Pa.R.A.P. 302(a). Further, in order to preserve an evidentiary issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. *See Hong v. Pelagatti*, 765 A.2d 1117, 1123 (Pa. Super. 2000). On appeal, this Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. *See id*. If appellate courts were to consider issues not raised in the trial court, then the trial would become a dress rehearsal and would give an unfair advantage to the ill-prepared

advocate. ***See Dilliplaine v. Lehigh Valley Trust Company***, 322 A.2d 114 (Pa. 1974).

Here, the record reveals that Braye did not object at any point during the victim's brief testimony regarding his involuntary commitment. Nor did Braye cross-examine the victim on the accuracy of her characterization of his commitment. When Braye addressed the trial court, he did not provide any testimony or documentation to establish that he was discharged under voluntary status or that his commitment was unfounded. Instead, Braye simply admitted to the trial court that the victim initiated involuntary commitment proceedings against him because "I was having a breakdown." N.T., 8/14/25, at 10. Thus, because Braye did not raise his third or fourth issues before the trial court, they are waived. ***See*** Pa.R.A.P. 302(a); ***see also Hong***, 765 A.2d at 1123.

In his fifth issue, Braye challenges the trial court's admission of the Jehovah's Witness pamphlet on the basis that it was not properly authenticated under Pa.R.E. 901(a), and the court failed to conduct a balancing test pursuant to Pa.R.E. 403.

Once again, we must determine whether Braye preserved this issue for our review. The record reveals that Braye did not raise any objection when the trial court admitted the pamphlet into evidence. ***See*** N.T., 8/14/25, at 9. Nor did Braye raise any objection when the trial court questioned him about the pamphlet, and asked him why he left it in the victim's mailbox. ***See id***.

at 17. Instead, Braye admitted to the trial court that he left the pamphlet in the victim's mailbox with the letter "for fun." *Id*. Thus, because Braye did not raise any challenge to the admission of the pamphlet in the trial court, his fifth issue is waived.

In his sixth issue, Braye contends that the trial court failed to consider his alibi testimony. Specifically, he claims that he "provided sworn testimony regarding his whereabouts during the relevant time period that contradicted [the victim's] version of when the incident occurred." Braye's Brief at 9. Braye asserts that the trial court's failure to address this contradictory evidence in its opinion or explain why it rejected Braye's alibi testimony constitutes reversible error.

As best we can discern, Braye appears to be referencing his testimony regarding the July 2025 encounter between the parties, following his release from commitment, when he was verbally abusive to the victim and attempted to physically restrain her. In his brief, Braye cites to the portion of the transcript wherein he addressed the victim's claims regarding the July 2025 encounter. *See* N.T., 8/14/25, at 12-13. Therein, Braye admitted that he had a cart belonging to the victim in the trunk of his car, and that the victim came to retrieve the cart. *See id*. at 12. Braye explained that he was still using the cart to organize his trunk. *See id*. Braye testified that when the victim approached him, he "ignored her completely," and continued to clean out his trunk. *Id*. Braye claims that he "had already told [the victim] that

- 17 -

when I was finished[,] I would return it back to her." *Id*. at 13. Braye indicated that he was not aggressive toward the victim during this encounter. *See id*.

While Braye insists that the trial court failed to consider his "alibi testimony," our review of the record discloses no such alibi testimony. Indeed, at the final PFA hearing, Braye did not claim that the July 2025 encounter did not occur, or that he was somewhere else when the encounter allegedly took place such that he had an "alibi." Instead, Braye *admitted* that there was an encounter between himself and the victim, and proceeded to detail the particulars of the encounter. *See* N.T., 8/14/25, at 12-13. Thus, Braye did not provide any alibi testimony. Instead, Braye simply testified to a different version of the encounter by claiming that he did not act aggressively toward the victim during their interaction. *See id*. at 13.

To the extent that Braye is attempting to challenge the trial court's finding that the victim's version of the encounter was credible, and that Braye's version was not credible, such a claim is unavailing. As we have already explained, we must defer to the credibility determinations made by the trial court as to the witnesses who appeared before it. *See K.B.*, 208 A.3d at 128. Thus, we are bound by the trial court's determination that the victim's testimony regarding the encounter was credible. Accordingly, we conclude that Braye's sixth issue merits no relief.

In his seventh issue, Braye contends that the trial court failed to address the wrongful retention of his property by the victim. Braye claims that his testimony established that the victim was improperly retaining his personal property, including gaming equipment and a bicycle, and that his "uncontroverted testimony" should have been considered in evaluating the reasonableness of his actions and his intent. Braye's Brief at 10. Braye further argues that the trial court erred by failing to rule on the property issue.

Once again, we must determine whether Braye preserved this issue for our review. Here, the only matter pending before the trial court was the victim's petition for a final PFA order against Braye. To the extent that Braye claims that the trial court should have ordered the victim to return his personal property, Braye made no such request to the trial court, either in writing or by oral motion at the final PFA hearing. Nor did Braye seek any modification of the final PFA order to permit him to retrieve any personal property from the victim. Thus, as Braye did not raise any claim that the victim should be ordered to return items to Braye when the matter was pending before the trial court, he failed to preserve such a claim for our review. *See* Pa.R.A.P. 302(a); *see also* Trial Court Opinion, 9/23/25, at 7 n.3 (wherein the trial court noted that the victim's wrongful retention of Braye's personal property "was never raised by [Braye] as an issue to address during the hearing").

Further, contrary to Braye's assertion otherwise, the record does not establish that the victim retained any of Braye's personal property. While

Braye attempted to frame a question to the victim during his cross-examination of her regarding her alleged failure to return a "gaming system," she testified that she had returned all of his items. *See* N.T., 8/14/25, at 4, 8-9. When Braye took the stand to provide testimonial evidence on his own behalf, he read the letter he wrote to the victim wherein he stated, "I can't find my PS4 controller. You might have it." *See id*. at 16. Thereafter, Braye vaguely indicated that the victim "has not returned everything to me," but he did not specify which things. *See id*. at 17. The record makes clear that Braye did not provide the trial court with any testimony regarding the victim's alleged retention of a gaming system or a bicycle. Accordingly, we conclude that Braye's seventh issue is waived.

In his eighth issue, Braye contends that the trial court violated his due process rights by denying him "meaningful opportunity to call witnesses, present closing arguments, and fully cross-examine [the victim] regarding inconsistencies in her testimony." Braye's Brief at 11. According to Braye, "[t]hese restrictions prevented [him] from presenting a complete defense and undermined the adversarial process essential to a fair adjudication." *Id*.

The trial court considered Braye's eighth issue and determined that it lacked merit. The trial court explained:

> In this case. [the victim] filed her [PFA] petition . . . on August 7, 2025, and a hearing was held seven (7) days later, on August 14, 2025. [Braye] clearly had notice of the hearing, as he appeared on August 14, 2025 in court, and indicated . . . that he wished for the matter to proceed to a hearing on that date. [*See*] N.T.[, 8/14/25, at] 3. In the documentation served upon [Braye],

- 20 -

he was provided with his rights for the final hearing. The court confirmed with [Braye] on August 14, 2025 that he was seeking to proceed self-represented and advised [Braye] that the court would assist both parties through the procedure of the hearing, as neither elected to be represented by counsel. [*See id*. at] 3-4. [Braye] was advised that he was able to testify on his own behalf if he chose, cross-examine [the victim] and any witnesses that [the victim] called, call witnesses himself, and present evidence in his case. [*See id*. at] 3-4, 6, 7, 10, 18.

Despite being advised that he could call witnesses and present additional evidence, [Braye] elected not to do so. [*See id*. at] 18. [Braye] clearly indicated to the court that he was resting his case without calling further witnesses, including his mother, who he indicated was present. [*See id*.] The court did not request, nor did either party request to make, closing arguments following testimony. After the court's ruling, [Braye] was clearly advised of the specific terms of the order that was being entered against him, and all collateral consequences, including weapons prohibition. [*See id*. at] 19-22. Therefore, [his eighth issue] should be dismissed as meritless.

Trial Court Opinion, 9/23/25, at 4-5 (footnote and unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion or error of law by the trial court. Nor do we perceive any violation of Braye's due process rights. Contrary to Braye's assertions, the record confirms that the trial court afforded him the opportunity to cross-examine the victim. *See* N.T., 8/14/25, at 6. Braye thereafter attempted to testify, and the trial court redirected him to ask questions of the victim, noting that "this is only your time to ask questions of her." *Id*. at 7. Braye then asked two questions of the victim on cross-examination before he indicated that he had "[n]o further questions."

*Id*. at 9. Thus, the record reflects that Braye had the opportunity to, and did, fully cross-examine the victim until he had no further questions to ask of her.

The record further reflects that the trial court specifically asked Braye, "[d]o you have any witnesses that you're calling?" *Id*. at 18. Braye responded, "I have many witnesses, but the only one I have now is my mother." *Id*. The trial court then asked Braye, "[a]re you calling your mother as a witness," and he responded "[n]o, but she is here." *Id*. The trial court then asked Braye if he was resting his case, and he responded, "I rest my case." *Id*. at 18-19. Thus, the record reflects that Braye was provided with an opportunity to call witnesses, but he declined to call any witnesses in support of his defense.

Finally, the record reflects that the trial court did not ask the parties to provide closing arguments, and neither party requested to present the court with any final argument. *See id*. at 19-22. Thus, the record does reveal any request by Braye to provide additional argument which was denied by the trial court. To the extent that Braye claims that the trial court should have offered him the opportunity to present a closing statement, Braye did not raise any objection at the end of final PFA hearing, at the time when the court could have permitted him to provide closing arguments. *See* Pa.R.A.P. 302(a); *see also Hong*, 765 A.2d at 1123 (holding that this Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected). Thus, any such claim is waived.

In sum, as each of Braye's issues are either meritless or waived, we affirm the trial court's final PFA order.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/15/2026